**ALPHAMED PHARMACEUTICALS CORP., Plaintiff,**

v.

**ARRIVA PHARMACEUTICALS, INC.; and SPINELLI CORPORATION, Defendants.**

**No. 03–20078 CV.**

United States District Court, S.D. Florida. Miami Division.

May 26, 2006.

port of dismissal for reasons of personal jurisdiction and *forum non conveniens*.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

Stephanie R. Lewis, Zelle Hoffmann Voebel Mason Gette, Los Angeles, CA, John C. Steele, Steven A. Lamb, Douglas

J. Rovens, Duane Morris, Miami, FL, for Plaintiff.

Frank Herrera, Herrera & Regalado-Herrera PA, Paul Joseph Riley, IV, Jonathan Goodman, Samuel Swain Heywood, Julie Elizabeth Nevins, Miami, FL, Akerman Senterfitt, James Alexander Stepan, Steven Eric Eisenberg, Jeffrey David Feldman, Feldman Gale, Miami, FL, David R. Chase, Hollywood, FL, Jason A. Crotty, Morrison & Foerster, San Francisco, CA, for Defendants.

## OMNIBUS ORDER ON DEFENDANTS' POST-TRIAL MOTIONS

ALTONAGA, District Judge.

 **THIS CAUSE** came before the Court on Defendant, Arriva Pharmaceuticals, Inc.'s ("Arriva['s]") Renewed Motion for Judgment as a Matter of Law [D.E. 904], filed on January 24, 2006; Arriva's Motion for New Trial and, in the Alternative, Motion for Remittitur [D.E. 923], filed on January 31, 2006; and Defendant, Spi-nelli Corporation's ("Spinelli['s]") Corrected Renewed Motion for Judgment as a Matter of Law [D.E. 928], filed on February 6, 2006.[1] The Court has reviewed the written submissions of the parties, the relevant portions of the record, and applicable law, and heard oral argument on March 7, 2006. For the reasons stated below, Defendants' Motions for Judgment as a Matter of Law and Arriva's Motion for New Trial are granted.

## I. BACKGROUND [2]

### A. The Roots of the Lezdey–Wachter Conflict

This litigation arose out of competition between former business partners turned bitter rivals, and between two companies involved in the potentially lucrative field of mass produced synthetic Alpha 1–Antitrypsin ("AAT").[3] John Lezdey ("Lezdey"), a research chemist and patent attorney, met Dr. Allan Wachter ("Wachter"), then a research scientist at the University

1. Contrary to the implication that pervades Plaintiff, AlphaMed Pharmaceuticals Corp.'s ("AlphaMed['s]") responses to Defendants' post-trial motions [*see, e.g.,* D.E. 952 at 1, comparing Spinelli to a "petulant child refusing to take no for an answer"], the Court's denial of earlier motions for summary judgment or judgment as a matter of law do not foreclose review of the same arguments pursuant to a properly filed post verdict motion. *Abel v. Dubberly,* 210 F.3d 1334, 1337(11th Cir.2000); *Robbins v. Milner Enterprises, Inc.,* 278 F.2d 492, 497 (5th Cir.1960) ( "[A]t times the issues may be such that only after the agony of a full-blown trial may it authoritatively be determined that there was never really the decisive issue of fact at all."). Indeed, the Supreme Court has very recently recognized that "while a district court is permitted to enter judgment as a matter of law when it concludes that the evidence is legally insufficient, it is not required to do so. To the contrary, the district courts are, if anything, encouraged to submit the case to the jury, rather than granting such motions." *Unitherm Food Systems, Inc. v. Swift–Eckrich, Inc.,* —— U.S. ——, ——, 126 S.Ct. 980, 988, 163 L.Ed.2d 974 (2006); *accord. Therrell v. Ga. Marble Holdings Corp.,* 960 F.2d 1555, 1568–69 (11th Cir.1992) (better to pass on sufficiency of evidence in context of post-verdict motion).

2. When considering a motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, the Court must evaluate all of the evidence, together with any logical inferences therefrom, in the light most favorable to the nonmoving party. *See Carter v. DecisionOne Corp.,* 122 F.3d 997, 1003 (11th Cir.1997). Accordingly, the facts summarized in this Order have been construed in AlphaMed's favor as the non-moving party.

3. AAT is a therapeutic protein (specifically, a serine protease inhibitor) produced naturally by the liver and released into the blood stream to protect tissue cells from damage caused by enzymes produced as a result of infection or inflammation within the body. It is believed that synthetically manufactured AAT can be used to treat a wide range of human and veterinary indications, and phar-

of Pennsylvania, in 1986. In the early 1990's, Lezdey and Wachter received several patents to use AAT to treat various indications. Together, they formed a joint venture, Sonoran Desert Chemicals LLC ("Sonoran"), a Nevada limited liability company, to hold these biotech patents. They also formed Protease Sciences, Inc. ("Protease"), as a subsidiary of Sonoran, to act as a licensing agent for the Sonoran patents.

In July 1997, Lezdey and Wachter co-founded AlphaOne Pharmaceuticals, Inc., now known as Arriva Pharmaceuticals, Inc.,[4] Arriva was formed to develop and commercialize recombinant protease inhibitors under an intellectual property license from Protease and Sonoran, for the treatment of respiratory, dermatological and inflammatory indications. The other founding members of Arriva's board of directors, Dr. Philip Barr[5] and David Kent, served as Chief Executive Officer and Chief Financial Officer of the company, respectively. In addition, Arriva employed Lezdey's sons, Darren Lezdey ("Darren") and Jarett Lezdey ("Jarett"), as business consultants.

In November 1997, Arriva and Protease signed a Term Sheet allowing Arriva to exploit the Sonoran Patents for one year. The Term Sheet delineated the conditions of a proposed license whereby Arriva would obtain the worldwide right to exploit the Sonoran patents. As a condition to a long-term license, however, Arriva was required to raise $4 million to fund its operations.

Soon after Arriva's formation, Lezdey became concerned that the new corporation was spending too much of its limited capital on salaries without showing any progress toward the development of AAT. Lezdey approached Wachter and suggested that the company reduce overhead expenses, particularly salaried positions, and "go virtual" in its efforts to identify licensees. Wachter rejected Lezdey's plan.

Dissatisfied with Arriva's inability to meet its financial or scientific benchmarks, Lezdey opposed the execution of a long term license for the Sonoran patents in Arriva's favor. In fact, in the absence of an executed license agreement, and because Arriva had been unable to obtain the financing required under the Term Sheet, Lezdey believed that Arriva's rights to exploit the Protease patents expired at the end of 1998. Unbeknownst to Lezdey, however, Arriva persuaded Wachter to sign a draft license agreement between Protease and Arriva.[6] Under the terms of that purported license agreement, Protease granted Arriva an exclusive license

---

maceutical companies all over the world have undertaken significant research efforts to develop a method for its mass production. In fact, AlphaMed maintains that the worldwide market for AAT derived pharmaceuticals exceeds $10 billion annually.

Currently, the United States Food and Drug Administration (the "FDA") has approved only one method for the mass production of AAT. This method derives AAT from blood plasma. The Bayer Pharmaceuticals Corporation manufactures the only drug on the market that uses blood derived AAT. Bayer's drug, Prolastin, has been approved by the FDA for the treatment of hereditary emphysema.

**4.** AlphaOne Pharmaceuticals, Inc. officially changed its name to Arriva Pharmaceuticals, Inc. on January 3, 2001. For case of reference and consistency, the Court refers to the Defendant corporation as Arriva.

**5.** Dr. Barr was hired by Arriva specifically because of his perceived expertise in the expression of AAT in *Saccharomyces cerevisiae* (commonly known as baker's yeast).

**6.** John Lezdey's assertion that the license agreement was executed without his approval is contradicted by a permanent injunction entered in *Wachter v. Lezdey,* Case No. CV–99–009335 (Ariz.Sup.Ct. Feb. 22, 2002) ("the Arizona court"). That order specifically states that "John Lezdey knew the material terms

to use the inventions claimed in the Sonoran patents.

In the early months of 1999, Lezdey's disagreements with, and estrangement from his business partner, Wachter, and other colleagues on the Arriva board continued to grow. On March 16, 1999, Lezdey was hospitalized with a stroke. While Lezdey was incapacitated and unable to participate, members of the Arriva board of directors held a board meeting, during which they expanded the board, removed Lezdey as Chairman, and vested certain stock options so that Protease was no longer Arriva's majority shareholder. Thereafter, over Lezdey's objections, Arriva entered into sub-license agreements with Baxter Healthcare Corporation ("Baxter") to develop a recombinant AAT product for respiratory indications, and with ProMetic Life Sciences, Inc. ("ProMetic") to develop a recombinant AAT product for dermatological and other indications.

Arriva did not obtain the necessary consent and approval of Protease/Sonoran to enter into the licenses with Baxter and ProMetic. Lezdey, who was still a member of Arriva's board of directors, questioned the validity of the purported Protease–Arriva license[7] and the subsequent sub-licenses with Baxter and ProMetic. In retaliation, Arriva terminated Lezdey and his sons in May 1999. Wachter then filed five lawsuits concurrently in four states against Lezdey, his family, and his companies.[8]

### B. The Formation and Early History of AlphaMed

Following their ouster from Arriva, Darren and Jarett Lezdey founded and incorporated AlphaMed Pharmaceuticals Corp. on July 20, 1999.[9] John Lezdey served as patent counsel and consultant to the new company. AlphaMed was established with two distinct divisions, an antimicrobial division and a pharmaceutical division. Within the antimicrobial division, the company produced and sought to distribute two disinfectant products, Noviguard and Germ Patrol.[10]

and conditions of the License Agreement, advised Dr. Wachter that the License Agreement was valid, and approved Dr. Wachter's execution of the License Agreement." *Id.* at ¶ 41. Arriva moved pre-trial to afford collateral estoppel effect to this and other findings of the Arizona court. [D.E. 594]. The undersigned denied Arriva's Motion, on the basis that "[t]he Arizona state court's findings ... do not bind AlphaMed, a nonparty to that litigation." [D.E. 710 at 2].

7. Protease's bylaws required that Lezdey, in his capacity as President, execute any agreement on behalf of the company. Hence, John Lezdey adopted the position that the license agreement was void because it was executed solely by Wachter on behalf of Protease. As noted *supra* n. 6, this position was rejected by the Arizona court.

8. Arriva vigorously contested AlphaMed's account and presented a far different explanation of the events that led to the separation of the Lezdeys from Arriva and the ensuing litigation. According to Arriva, John Lezdey extorted Arriva's board of directors into hiring Darren and Jarett Lezdey. In addition, Arriva maintained that the Lezdeys attempted to steal Arriva's confidential, proprietary, trade secret information and exhibited erratic, abusive, and threatening behavior toward Arriva's staff and potential business partners. Arriva also maintained that Darren and Jarett committed fraud by submitting resumes to Arriva which falsely stated that each had received masters degrees. The Lezdeys denied all of these accusations.

9. Jarett Lezdey serves as President of AlphaMed and his brother Darren serves as Vice–President.

10. Noviguard and Germ Patrol are different names for the same antibacterial, antiviral spray product. The only difference between the products is their respective target customer bases. Noviguard is focused on industrial users while Germ Patrol is marketed directly to retail consumers. According to Jarett Lez-

The focus of the AlphaMed pharmaceutical division was to produce and distribute AAT domestically and internationally for human and veterinary use. AlphaMed approached the production of AAT through two methods, a proprietary recombinant yeast production system and a method based on expressing AAT in transgenic bovine milk. In addition to AAT, AlphaMed's pharmaceutical division explored the development and distribution of veterinary and cosmetic products utilizing Cromolyn.

Like Arriva, AlphaMed claimed an interest in Sonoran's intellectual property. On September 2, 1999, Protease entered into a license agreement with AlphaMed whereby AlphaMed obtained the right to use the Sonoran patents to develop, manufacture and sell AAT products to treat a variety of non-human conditions and disorders, including skin conditions and disorders, eye and ear conditions and disorders, viral diseases and conditions and wounds. In addition, this license allowed AlphaMed to use the Sonoran patents to pursue a variety of human conditions including skin wellness and enhancement, cosmetic applications, wound healing, carcinoma, ear diseases and conditions and allergic rhinitis. As a cautionary measure, the Protease–AlphaMed license was specifically drafted so as not to conflict with the purported Protease–Arriva license. On March 1, 2000, Protease and AlphaMed entered into a second license agreement that expanded AlphaMed's rights to use the Sonoran patents to manufacture and sell AAT treatments for human respiratory disorders and conditions, treat human skin disorders, treat human viral diseases and conditions, and treat human eye conditions and diseases.[11]

Cognizant of their similarity in mission, AlphaMed sought to differentiate itself from Arriva.[12] First, unlike Arriva, AlphaMed's business plan called for initially targeting the veterinary and non-regulated overseas, pharmaceutical and cosmetics markets for AAT, including treatment of eye and ear infections, and then gradually entering the market for FDA approved uses of AAT. By focusing initially on these markets, AlphaMed hoped to achieve a first mover advantage in the AAT marketplace. According to AlphaMed, the production of AAT for markets with little or no regulation carried the added benefit of allowing the company to generate immediate profits without expending time and capital on clinical trials and other aspects of the FDA approval process. AlphaMed hoped to secure a tremendous advantage by being the first to mass market a product in the AAT industry, thereby developing brand name

dey, "[AlphaMed's] product is unique. It's different than Lysol in that it lasts 28 days. If you spray the surface, it will kill the germs, everything on the surface, 28 days." [T.R. Vol. 15 at 17, ll. 23–25]. Distribution of these two products is currently accomplished through an AlphaMed wholly owned subsidiary. Better World Distributors, Inc.

11. The permanent injunction entered by the Arizona court affirmatively declared these two Protease–AlphaMed licenses to be "wholly void and of no effect." *Wachter v. Lezdey*, Case No. CV–99–009335 (Ariz.Sup.Ct. Feb. 22, 2002) at ¶ 72. The order also enjoined Darren and Jarett Lezdey from "taking any actions in any capacity to give effect to (or to draw for themselves or any entity, including but not limited to. AlphaMed Pharmaceuticals, Inc. any benefit from) the invalid License Agreements between Protease Sciences, Inc. and AlphaMed Pharmaceuticals, Inc." *Id.* at 14.

12. For example, Darren Lezdey testified that "AlphaMed took a different track in our manufacturing of Alpha 1–Antitrypsin. Instead of spending millions on building a lab, hiring scientists at $250,000 a year, or whatever the going rate is, we decided to outsource and pay professionals that already had this stuff set up, monies to do all that stuff, and then manage it from AlphaMed's offices in Clearwater." [T.R. Vol. 2 at 153, ll. 11–17].

recognition while generating cash flow to fund research and development work for FDA approved AAT treatments.

Second, AlphaMed developed its own proprietary recombinant yeast production system using *Pichia pastoris* yeast cells, while Arriva was working to produce recombinant AAT product from a different strain of yeast cells, *Saccharomyces cerevisiae*.[13] In December 1999, AlphaMed experienced a substantial breakthrough when Invitrogen, a gene bank located in Carlsbad, California, was able to express AAT in the *Pichia pastoris* gene. In January 2000, AlphaMed partnered with the University of Nebraska to use the clone produced by Invitrogen to manufacture and purify enough recombinant AAT to begin clinical studies toward the eventual goal of FDA approval.[14] In March 2000, AlphaMed submitted a patent application for its promising AAT production method.

AlphaMed attracted early venture capital investment to fund the execution of its business plan. On August 3, 1999, AlphaMed enticed Robert C.E. Williams ("Williams"), an international venture capitalist with operations and investments in the United States and the United Kingdom,[15] to invest $150,000 in the company. Subsequently, pursuant to a December 7, 1999 subscription agreement, Williams invested an additional $1 million in AlphaMed.

Despite an auspicious beginning, however, AlphaMed experienced difficulty attracting other significant outside investors[16] and realizing anticipated revenues from its antimicrobial division.[17] Beginning in the summer of 2000, AlphaMed started to run out of money and the company found itself increasingly unable to meet financial obligations to its staff, its licensor,[18] or its partners. AlphaMed's fi-

---

**13.** John Lezdey explained that he preferred *Pichia pastoris* to *Saccharomyces cerevisiae* for mass production of recombinant AAT because when AAT is "expressed in *Saccharomyces*, you have to break apart the yeast to get the AAT and when you break apart the yeast, there is [sic] a lot of antigenic particles in there which can cause injury to a person using it over long periods of time .... *Pichia* was preferred for me because *Pichia* actually spit out the AAT. You didn't have to crack open the yeast. It spit it out and it was floating on top. You scoop it out and the *Pichia* continues making the AAT ...." [T.R. Vol. 21 at 176, ll. 14–18, 23; 177, *l.* 1].

**14.** Dr. Michael Meagher, who oversaw the University of Nebraska's work with AlphaMed, testified that *"Pichia pastoris* was able to secrete Alpha I–Antitrypsin at levels, probably 20 to 50 milligrams per liter in a shake flask, which is acceptable. We put it in a fermenter and were able to generate about 200 mgs. per liter in a fermenter which is, from our perspective, to move into phase I clinical studies under those conditions we would have enough to make protein to do their initial animal studies." [T.R. Vol. 5 at 125, ll. 24–25; 126, ll. 1–6].

**15.** Williams is the former Chief Executive Officer of Unipalm, a large European internet service provider.

**16.** Other than Williams, AlphaMed's only outside investors were Carl Sutherland, the husband of noted television talk show personality Sally Jessie Raphael, who invested $50,000 in the company, and George Eigle, who invested $10,000.

**17.** AlphaMed relied, in part, on generating revenue from its antimicrobial division to fund development of its consumer ready and prescription AAT and cromolyn products. AlphaMed's October 2000 business plan estimated that the company's antimicrobial sales would generate $416,001 in revenue by the end of March 2001 (first quarter) and $4 million by the end of 2001. In actuality, AlphaMed fell well short of both of these anticipated goals, generating only $50,000 in antimicrobial sales through 2004.

**18.** All patents for *Pichia pastoris* and licenses for its use as an expression system are owned by Research Corporation Technologies, Inc. ("RCT"), a technology investment and management company based in Tucson, Arizona.

nancial difficulties and mounting debts reached such a critical point that the University of Nebraska was forced to suspend work on AlphaMed's purification project on November 22, 2000. Even though Williams had indicated his willingness to support AlphaMed through this difficult time,[19] Darren Lezdey explained that AlphaMed was reluctant to ask Williams for an immediate infusion of the funds necessary to resume work with the University of Nebraska because AlphaMed "wanted to show [Williams]...we could go out and get more money on our own." [T.R. Vol. 2 at 193, ll. 24–25].

Starting in the fall of 2000, AlphaMed and Williams began negotiating a significant, open-ended, finance agreement whereby Williams would invest an additional $750,000 to $1.5 million to get AlphaMed to the next stage in its AAT production plan. During negotiations in early 2001, true to his representation to the Lezdeys that he would be their "fuel tanker," Williams made further investments in AlphaMed which were used to pay salaries and keep the company running. AlphaMed intended to use Williams' large, negotiated investment to restart its purification work at the University of Nebraska. Michael Weber was Williams' advisor and AlphaMed's General Counsel, and testified that Williams' additional investment was the critical step that AlphaMed needed to complete its work with the University of

Nebraska and attract further significant investment.

> Bob Williams was willing to put in enough money to get Dr. Meagher to completion where he would have purified AAT and we would be able to start using with further tests on animals and the neutraceuticals that would help us start to generate cash if we were producing it, but we would clearly have product where we would be able to run tests and show institutional investors that we, that AlphaMed was a serious player, it had AAT and we were ready to move.

[T.R. Vol. 11 at 57, ll. 9–16]. Unfortunately, for reasons that were not explained, nor apparent to AlphaMed at the time, Williams abruptly ceased negotiations with AlphaMed in April 2001 and refused to make any further investments in the company.

### C. Malfeasance by Arriva and Spinelli

Soon after AlphaMed's formation in 1999, Arriva realized that the spurned Lezdeys' new company might present a firm challenge to Arriva's previously uncontested position in the potentially lucrative field of yeast derived recombinant AAT. Commencing an effort to maintain an advantage over its competitor, Arriva retained Spinelli Corporation, a private investigative agency founded and staffed by former agents of the Federal Bureau of Investigation ("FBI") and based in Phoenix, Arizona, to conduct a campaign of corporate espionage against AlphaMed.[20]

---

AlphaMed entered into a license with RCT for use of the *Pichia* system, but defaulted on its required licensing fees and royalty payments beginning in October 2000.

19. In fact, Williams testified that he told the Lezdeys that "I will be your fuel tanker during the operation of getting venture financing. When you need some money, I will give you some money on a bridging loan basis and keep you going." [T.R. Vol. 19 at 23, ll. 22–25; 24, *l.* 1].

20. AlphaMed's allegation that Arriva retained Spinelli to conduct corporate surveillance was vigorously contested throughout the course of this litigation. Arriva maintained that Wachter, rather than Arriva, hired Spinelli. In addition, Arriva was dismissive of AlphaMed's argument that the two companies were ever competitors. According to Arriva, Spinelli was not retained to investigate AlphaMed's business. Rather, Spinelli was hired to conduct surveillance on the Lezdey family in order to protect the personal security of Wachter and his family. Spinelli's retention was directly precipitated by a phone call from

Arriva utilized Spinelli to obtain confidential, proprietary and trade secret documents concerning AlphaMed's business and the Lezdeys' litigation strategy in their multiple lawsuits with Wachter. This information was acquired through several methods including: a procedure known as "trash pulling" where Spinelli's investigators searched AlphaMed's trash, the retention of a covert informant within AlphaMed to turn over confidential information,[21] direct surveillance, and Spinelli's retention of an unlicensed private investigative service, Blue Moon Investigations, Inc. ("Blue Moon"), to obtain non-public information and phone records.

Arriva also disrupted AlphaMed's attempts to collaborate with other biotech companies. Beginning in the summer of 2000, AlphaMed began exploring a partnership with the Pharming Group ("Pharming"), a Dutch Biotech company focused on the production of proteins in animal milk, to develop bovine-derived AAT. Discussions between AlphaMed and Rein Strijker, Pharming's Chief Business Officer, continued until January 2001 when Martin Preuveneers ("Preuveneers"), then Arriva's Chief Executive Officer, contacted Strijker and dissuaded Pharming from doing business with AlphaMed.[22]

Finally, Spinelli fraudulently induced the FBI to open multiple criminal investiga-

---

Jarett Lezdey to Wachter's wife, Susan, in which Lezdey threatened to kill her and her children. In addition, among other allegations, Arriva accused the Lezdeys of shooting out the windows of Wachter's office; orchestrating a pepper-spray attack on Dr. Barr's wife, Claire; arranging the vandalization of cars in Arriva's parking lot with acid; and mailing a live tarantula to an attorney retained by Wachter. AlphaMed denied each of these allegations.

**21.** Arriva and Spinelli have admitted to obtaining thousands of pages from AlphaMed, but they repeatedly denied using illegal means to obtain those documents. Arriva and Spinelli maintain that they came into possession of the documents by retrieving them from AlphaMed's publicly available trash. AlphaMed contends that Spinelli's trash pulls violate § 32.274 of the Code of Ordinances of Clearwater, Florida (the "Clearwater Code"), which makes the act of "scavenging" through trash unlawful and punishable by fine. The Clearwater Code defines "scavenging" as the unauthorized removal of "any marketable materials" from the trash when placed out for collection.

In addition, AlphaMed also argues that certain of its confidential documents were not discarded and could only have been obtained through the employment of a covert source or operative. Spinelli's contemporaneous reports make reference to a source referred to as "ECHO," who/which was described by Spinelli as follows: "ECHO is in fairly frequent contact with the Target family. Apparently the family has sufficient confidence in

ECHO that various members at various times confide certain aspects of the patent business and of their lawsuit against Dr. Wachter to ECHO." [Pl.'s Exh. 138]. AlphaMed maintains that "ECHO" was a code name for Spinelli's covert informant within the company. Spinelli contends that "ECHO" was simply a code name for its trash pulling operation.

**22.** Preuveneers emailed Strijker on January 15, 2001:

Further to our short meeting last week at the H & Q conference I wonder wheththter [sic] you can help us. You may recall that we told you about a company that has been established which may falsely claim rights to alpha-I antitripsin [sic] use patents. That company is AlphaMed and has been set up by a former director of AlphaOne pharmaceuticals. As you may recall AlphaOne Pharmaceuticals has an [sic] court injunction restrain [sic] the directors of AlphaMed, Mr. Lezdey and his two sons, from contacting prospective companies in an attempt to effect a business deal to their advantage concerning a license to alpha–1 antitrypsin. We were surprised to hear from you that you had indeed been contacted by a representative from AlphaMed which is clearly in breach of the court injunction which has been obtained. To this end we would be very grateful if you could forward any correspondence you have received from AlphaMed so that we can protect the exclusive license we have paid for. As I mentioned to you our partner Baxter

tions against AlphaMed and the Lezdeys in order to disrupt AlphaMed's business. Although none of these FBI investigations resulted in the filing of criminal charges against AlphaMed or the Lezdeys individually, they cast a shadow over the company. As a result, Arriva eventually succeeded in its strategy to use the FBI to cripple AlphaMed's fund raising capacity and permanently drive its competitor out of the capital intensive business of AAT production.

In July 2000, Arriva and Spinelli induced FBI Special Agent James R. Conner III ("Conner") to investigate AlphaMed and the Lezdeys for bankruptcy fraud and investor fraud.[23] Based on the information that it had obtained through Spinelli's corporate espionage, Arriva knew AlphaMed's timing, direction, progress, and importantly, the identity of its primary investor, Williams. On February 23, 2001, Wachter, Spinelli, Dr. Barr and Sy Sacks, an Arizona lawyer representing Wachter, met with Conner to discuss his investigation. At the meeting, Spinelli prepared Conner to interview Williams, and provided him with a list of questions to use. The proposed questions that Spinelli gave to Conner demonstrate that Arriva and Spinelli were focused on AlphaMed's business, rather than any purported fraud.

Conner proceeded to contact Williams on multiple occasions in the midst of AlphaMed's critical financing negotiations with its most significant investor. Initiating his contact, Conner stated that he was investigating a complaint made by "members of the Wachter family against the Lezdey family." He further explained to Williams that the Lezdey family was dangerous, that members of the Lezdey family had made threats against the Wachter family and that John Lezdey was suffering from senility. As a result of these disturbing, yet false, revelations, Williams decided to refrain from making any further investments in AlphaMed.

### D. Trial and Verdict

This case was tried to a jury beginning on September 22, 2005. AlphaMed presented three claims: (1) misappropriation of trade secrets against Arriva and Spinelli; (2) tortious interference with an advantageous business relationship (related to AlphaMed's relationship with Williams) against Arriva; and (3) common law unfair competition against Arriva.[24] At trial, AlphaMed presented a single theory of recovery—lost profit damages.[25] AlphaMed's

---

are [sic] fully aware of Mr. Lezdey's illegal activities.

As a result of Preuveneers' correspondence, Strijker emailed Dr. Anne Kronis, then-AlphaMed's Chief Scientific Officer, on January 16, 2001 and advised her that, "[g]iven this situation and given the fact that Pharming, most certainly, does not want to be a party in this litigation, I propose that we suspend further contacts until after the legal dispute between you and alpha-one has been settled."

23. On March 16, 2000, Protease's creditors (including the Lezdeys) filed an involuntary bankruptcy against the company in the United States Bankruptcy Court for the District of Nevada. Arriva contends that this Protease involuntary bankruptcy proceeding was fraudulently orchestrated by the Lezdeys to gain a strategic advantage over Wachter in other pending litigation. Arriva also contends that AlphaMed was defrauding its main investor, Williams, by allocating his investments to fund the Protease bankruptcy proceeding rather than scientific research. The Protease bankruptcy was formally dismissed pursuant to settlement on February 23, 2001.

24. AlphaMed's claims were framed by its Fourth Amended Complaint ("FAC") [D.E. 368], filed on January 25, 2005. On April 15, 2005, the Court issued an Order [D.E. 436] dismissing Count I of Plaintiff's FAC relating to ownership of the rights to U.S. Patent No. 6,174,859 and striking certain portions of the FAC.

25. Federal Rule of Civil Procedure 26(a)(1)(C) requires disclosure of "a computation of any

expert witness, V. Water Bratic ("Bratic"), testified that:

> AlphaMed had a window of opportunity in the fall, spring, fall, 2000, spring of 2001 with respect to the work being done at the University of Nebraska with respect to purifying and proving up commercial production of, the ability to commercially produce quantities of AAT using the *Pichia pastoris* yeast method of production and they needed additional financing in that window of time to finish up the work at the University of Nebraska so they could go forward with a proven delivery platform, if you will, for the manufacture of pure, high grade, high quantities of AAT to be able to attract additional capital to launch the AAT delivery platform for AlphaMed.

[T.R. Vol. 16 at 45, ll. 9–20]. Critically, Bratic assumed that Defendants' conduct caused AlphaMed's window of opportunity to close before the company could take advantage of it.

To calculate the amount of damages flowing from this injury, Bratic engaged in a "but for" analysis, determining the amount of profits AlphaMed would have been able to achieve under applicable market conditions had it not suffered the injuries alleged. As he explained:

> but for certain alleged actions, conduct, the question is where would the company have been. So, I started with the premise assuming that there was wrongful interference with the company's window of opportunity and its ability to grow its business. I then looked at the impact of that and I estimated that the impact of that activity, that wrongful conduct, the impact of it would be at least a five year delay in the company executing its business plan because here we are at the end of 2005 and the com-

category of damages claimed by the disclosing party...." During pre-trial discovery, Spinelli asked AlphaMed to "state the damages which you are seeking in this matter and set forth the manner in which you calculated those damages." In response, AlphaMed served the report of its damages expert, V. Walter Bratic, who opined that AlphaMed had suffered lost profit damages in the amount of $79.5 million. AlphaMed also represented that its "damages are a matter of expert testimony." [*See, e.g.,* D.E. 564].

On August 23, 2005, the Court struck a "supplemental" expert report by Bratic in which AlphaMed untimely advanced "lost royalties" as an alternative theory of damages. The undersigned excluded Bratic's supplemental report on the ground that it "presents a brand new theory of damages not disclosed in the initial report." [D.E. 688 at 14]. Accordingly, the sole measure of Plaintiff's damages admissible at trial was the lost profits analysis offered by AlphaMed's expert witness in his initial report. *See Zenith Electronics Corp. v. WH–TV Broadcasting Corp.,* 395 F.3d 416, 420 (7th Cir.2005) (affirming district court's exclusion of damages evidence based on failure of proponent party to re-

spond to an "interrogatory with a description of its damages theory and the proof to be employed"); *Design Strategies, Inc. v. Davis,* 367 F.Supp.2d 630 (S.D.N.Y.2005) (striking claim for lost profits for failure to comply with discovery rules); *ESPN, Inc. v. Office of the Comm'r of Baseball,* 76 F.Supp.2d 416, 420 n. 3 (S.D.N.Y.1999) ("Regardless of the merits of Baseball's alternate theory, I reject it as a basis for the calculation of damages. Baseball's failure to mention this alternate theory of damages until six days before trial— months after the close of discovery and weeks after the submission of pre-trial motions— bars it from presenting such a theory at trial."); *Point Prods. A.G. v. Sony Music Entm't, Inc.,* 2002 U.S. Dist. LEXIS 24450, 2002 WL 31856951 (S.D.N.Y. Dec.19, 2002) (same, citing *ESPN, Inc.*); *Gilvin v. Fire,* 2002 U.S. Dist. LEXIS 15249 at * 8, 2002 WL 32170943 at *3 (D.D.C. Aug.16, 2002) ("At no time prior to filing the Pretrial Statement did Plaintiff identify any actual damages resulting from [defendant's conduct], let alone provide a computation of such damages in accordance with Fed.R.Civ.P. 26(a)(1)(C).... Because Plaintiff failed to provide Defendant with a computation of his damages ... and failed to provide any factual basis whatsoever

pany was projecting early on that in 2001 it would start releasing products, and so I just pushed everything back five years because actually we're on the eve of six years with 2006, but I just assumed a five year delay in shift in the company's ability to get to market with its products.

[T.R. Vol. 16 at 66, ll. 16–25; 67, ll. 1–4].

In arriving at his lost profits calculation, Bratic applied a discount rate to account for various risks associated with the projected amount of lost revenue over the relevant time period.

> I used [a discount rate of] 35 percent. This drug has actually been proven— AAT is a proven drug. It's out there on the market today. The Prolastin drug produced from blood plasma is an AAT treatment regimen, I believe, for hereditary emphysema that has been approved by the FDA and been on the market since 1989. We're not dealing with an unknown drug. What we're dealing with is a new method of production, in other words, generating commercial quantities of this particular drug in pure quantities extracted from yeast, as opposed to blood plasma. Plus, we're dealing, in my particular analysis, we are not dealing with a brand new drug. We are dealing with products that don't even need regulatory approval, antimicrobial products—you have probably heard the term "Noviguard"—and some of these other products which are, basically, cleaning agents, certain types of cosmeceuticals, basically, treating, cosmetic treatments for skin and even treating animals for various veterinary purposes. So, I have a combination of products in there and, in my opinion, based on the other documents seen and the other discount rates used by various parties in this litigation, I used the 35 percent discount rate which I thought was very reasonable.[26]

[T.R. Vol. 16 at 68, ll. 16–25; 69, ll. 1–12].

After explaining his methodology, Bratic testified as to his ultimate opinion on AlphaMed's lost profit damages.

> Now, there were two components to ... [AlphaMed's] damages.... One is their lost profits relating to the original initial products that the company was going to launch, antimicrobial products, which are, basically, disinfectants and cleaning products, various veterinary products, like for hot spots, things like that, on

---

for the claim, Plaintiff may not present evidence at trial of those damages.").

**26.** In his expert report issued on February 7, 2005, Bratic attributed his decision to employ a 35% discount rate to the opinion of Brian Napper, an expert witness employed by Wachter to perform a damage calculation before the Arizona Court. [*See* Bratic Depo. at 264]. The undersigned ruled pre-trial that "to the extent that any portion of Bratic's report relies solely on Napper's expert report, that portion is inadmissible." [D.E. 758 at 13]. The Court additionally held that "while Bratic's specific application of the 35% discount rate is excluded because it was admittedly lifted from Napper's report, Bratic may opine hypothetically, and consistent with his expertise, as to the discount rate generally applicable to biotech startup companies." [*Id.*]

At trial, the Court admitted the Napper report into evidence for a limited purpose unrelated to its conclusions. The Court instructed the jury that:

> Mr. Napper is not an expert retained in this case and he has not analyzed AlphaMed's business plan or any other information concerning AlphaMed's alleged damages. I am allowing the Napper report into evidence for a limited purpose, because it may have some bearing on the methodology which Mr. Bratic used when providing his opinion testimony concerning AlphaMed's alleged damages. Therefore, you should understand that the Napper report does not directly relate to AlphaMed's alleged damages. You may, but are not required to, consider the Napper report for the limited purpose I have explained to you.

[T.R. Vol. 34 at 76, ll. 7–17].

dogs and cats and the like, and nonregulated pharmaceuticals which would be things like cosmeceuticals, skin creams and things like that. Those damages for delay in getting in the market for a five year period you will see in the next chart were $45.9 million. Then as to unfolding and releasing products down the road regarding emphysema and asthma treatment, for example, those damages were $33.6 million. So, when you add both of those components of damages, the $45.9 million, the $33.6 million, you end up with $79.5 million as the total damages.

[T.R. Vol. 16 at 74, ll. 5–22].

Pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, Arriva and Spinelli moved for judgment as a matter of law at the conclusion of AlphaMed's case-in-chief and again at the close of all the evidence. These motions were denied and the case was submitted to the jury. On December 19, 2005, after five days of deliberations, the jury returned a verdict in favor of AlphaMed, and against Arriva and Spinelli, on each of the claims.[27] The jury awarded AlphaMed $1.00 in damages against both Arriva and Spinelli on the claim for misappropriation of trade secrets;[28] $26 million in compensatory damages against Arriva on the claim for tortious interference with advantageous business relationship; and $22 million in compensatory damages against Arriva on the claim for unfair competition. On January 4, 2006, the jury returned a verdict on punitive damages against Arriva, awarding $20 million on the claim for tortious interference and $10 million on the claim for unfair competition. In total, the jury awarded AlphaMed damages in the aggregate amount of $78,000,002.00.

---

**27.** To guard against potential overlap between the actions underlying AlphaMed's first two claims and the third claim for unfair competition, the Court instructed the jury to list the acts which it unanimously found constituted unfair competition against AlphaMed. The jury's response was as follows: "1)Arriva's act misappropriating the trade secrets in AlphaMed's documents; 2)Arriva's act of interfering with AlphaMed's business relationship with Robert Williams through FBI Special Agent Conner; 3) When AlphaOne/Arriva improperly accepted the signature of Alan (sic) Wachter as Protease Science CEO the process of unfair competition began as the Protcase Science By-laws do *not* provide for said office and the authority for signing contracts to the President; 4) The AlphaOne/Arriva CEO Martin Preuvencers contact of Rein Striker (sic) of Pharming alleging that AlphaMed had stolen intellectual property and asking for all Pharming–AlphaMed correspondence was a deliberate act of unfair competition; 5) The Nevada Federal Court ruling of September 28, 2000, ordered the Arizona State Court to only address the issue of John Lezdey as to obstruction of discovery; Alan (sic) Wachter was not to seek contempt charges; the Protease Science dispute was to be properly heard in the Nevada court thus the multiple court cases which followed this ruling in Arizona are deemed a tactic of unfair competition; 6) Additionally, the Nevada Federal Court Bankruptcy Settlement of February 12, 2001, is deemed a tactic of unfair competition as the ruling omits the court's previous and favorable ruling from the case history record; the agreement to pay-off the outside creditors of Protease Sciences was an act to continue unfair competition via invalidating the 9/28/2000 order by settlement without following through in compensating Protease creditors (lawyers were compensated but not other outside creditors); 7) The 'garbage' spoke for itself as did Spinelli Investigation documents as to intentionally gathering confidential and proprietary AlphaMed documents without demonstrating concern for personal security issues." [D.E. 866 (Special Interrogatory No. 22) at 8–9].

**28.** Prior to the trial, the Court found that "AlphaMed has provided no evidence of the amount of its damages relating to the misappropriation of trade secrets count." [D.E. 688 at 12]. Accordingly, AlphaMed was limited to the recovery of nominal damages on this claim.

## II. *LEGAL STANDARD*

### A. *Judgment as a Matter of Law*

Defendants' Motions for Judgment as a Matter of Law are governed by Federal Rule of Civil Procedure 50(b). Under this standard, "[a] district court should grant judgment as a matter of law when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." *Pickett v. Tyson Fresh Meats, Inc.,* 420 F.3d 1272, 1279 (11th Cir.2005) (citation omitted). Conversely, the Court should deny the motion "if the plaintiff presents enough evidence to create a substantial conflict in the evidence on an essential element of the plaintiff's case." *Id.* (citations omitted). "Although [the Court] look[s] at the evidence in the light most favorable to the non-moving party, the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." *Campbell v. Rainbow City,* 434 F.3d 1306, 1312 (11th Cir.2006).

The Court "must review all of the evidence in the record and must draw all reasonable inferences in favor of the non-moving party." *Cleveland v. Home Shopping Network, Inc.,* 369 F.3d 1189, 1192–93 (11th Cir.2004) (citing *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 148–51, 120 S.Ct. 2097, 147 L.Ed.2d 105(2000)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves,* 530 U.S. at 150, 120 S.Ct. 2097. "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151, 120 S.Ct. 2097.

While the Court affords due deference to the jury's findings, it is axiomatic that such findings are not automatically insulated from review by virtue of the jury's careful and conscientious deliberation or detailed answers to special interrogatories. Rule 50 allows the trial court to remove issues from the jury's consideration "when the facts are sufficiently clear that the law requires a particular result." *Weisgram v. Marley Co.,* 528 U.S. 440, 447, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2521, at 240 (2d ed.1995)). A jury verdict is not entitled to "the benefit of unreasonable inferences, or those at war with the undisputed facts." *United Fire & Cas. Ins. Co. v. Garvey,* 419 F.3d 743, 746 (8th Cir.2005) (citation omitted); *Fenner v. Gen. Motors Corp.,* 657 F.2d 647, 651 (5th Cir.1981) ("a jury may properly reconstruct a series of events by drawing an inference upon an inference. The inference relied upon, however, must be reasonable. An inference may be unreasonable if it is at war with uncontradicted or unimpeached facts.") (internal quotation and citation omitted).[29]

### B. *Motion for New Trial*

If alternative motions for judgment as a matter of law and for new trial are presented, the Court should rule on the motion for judgment, and "whatever his [or her] ruling thereon he [or she] should also rule on the motion for a new trial, indicating the grounds of his [or her] deci-

---

**29.** *See, e.g., Holland v. Allied Structural Steel Co.,* 539 F.2d 476. 483 (5th Cir.1976) ("A careful examination of both the trial transcript and the documentary evidence ... compels the conclusion that a significant portion of the testimony given by the Plaintiff's witnesses was incredible as a matter of law."); *Ralston Purina Co. v. Hobson,* 554 F.2d 725, 728–29 (5th Cir.1977) ("completely self-serving testimony, unsupported by other evidence and in the teeth of universal experience, will not support a jury verdict.").

sion." *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 253, 61 S.Ct. 189, 85 L.Ed. 147 (1940); *see also* Fed.R.Civ.P. 50(c)(1). Pursuant to Federal Rule of Civil Procedure 59(a), "[a] new trial may be granted to all or any of the parties and on all or part of the issues ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States...." Although a comprehensive list of the grounds for granting a new trial is elusive, the Supreme Court has held that a motion for a new trial may rest on the fact that "the verdict is against the weight of the evidence, that damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co.,* 311 U.S. at 251, 61 S.Ct. 189.

A trial judge has greater discretion in ruling on a motion for new trial than when ruling on a motion for judgment as a matter of law. This is because even if the evidence in support of the verdict is substantial, a new trial may be ordered if the verdict is against the great weight of the evidence, if damages are excessive and shock the conscience of the court, if substantial errors occurred during the proceedings, or to prevent injustice. *See, e.g., Williams v. City of Valdosta,* 689 F.2d 964, 973 (11th Cir.1982) ("A trial judge may grant a motion for a new trial if he believes the verdict rendered by the jury was contrary to the great weight of the evidence."); *Lipphardt v. Durango Steakhouse of Brandon,* 267 F.3d 1183, 1186 (11th Cir.2001) (" 'new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence' ") (quoting *Hewitt v. B.F. Goodrich Co.,* 732 F.2d 1554, 1556 (11th Cir.1984)); *Whelan v. Abell,* 939 F.Supp. 44, 46–47 (D.D.C.1996).

## III. *ANALYSIS*

AlphaMed presented competent and sufficient evidence to prove to the jury's satisfaction that 1) Arriva and Spinelli exhibited tortious and anti-competitive behavior, and that 2) AlphaMed was unable to execute its business plan. In order to prevail on any of its claims, however, it was incumbent on AlphaMed to produce sufficient evidence to link these findings and demonstrate that Defendants' conduct caused AlphaMed's failure to realize its anticipated profits. *See e.g., Polar Bear Prods. v. Timex Corp.,* 384 F.3d 700, 710 (9th Cir.2004) ("Polar Bear's financial losses were not of Timex's making, and mere speculation does not suffice to link the losses to the infringement."). AlphaMed's failure to link Defendants' conduct to any damage that it may have suffered is fatal to each of its claims and compels the Court to vacate the jury's verdict in its entirety.

### A. *Spinelli's Motion for Judgment as a Matter of Law*

Spinelli, joined by Arriva, moves for judgment as a matter of law on AlphaMed's misappropriation of trade secrets count on three grounds. The first argument is that AlphaMed cannot recover under the Uniform Trade Secrets Act ("UTSA") because it did not present any evidence of damages as required by Fla. Stat. § 688.004. The second argument is that AlphaMed did not provide any evidence of a confidential informant. The last argument directed at the misappropriation of trade secrets count is that AlphaMed did not articulate which of the trash documents were claimed to be "trade secrets" and which were not. The Court is persuaded by Spinelli's first argument and accordingly vacates the jury's verdict of

both liability and nominal damages with respect to AlphaMed's claim for misappropriation of trade secrets.

Florida's codification of the UTSA ("FUTSA") provides that the owner of a trade secret that has been misappropriated may seek to redress such injury by obtaining injunctive relief, monetary relief, or both. *See* Fla. Stat. §§ 688.003, 688.004.[30] With respect to the recovery of damages, the statute specifically provides, in relevant part, that

> Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

Fla. Stat. § 688.004.

■ In its Fourth Amended Complaint ("FAC"), AlphaMed elected to seek damages alone and did not maintain a claim for injunctive relief.[31] Having chosen its remedy, AlphaMed bore the burden of proving its claim for damages pursuant to the stat-

ute. However, as the Court recognized prior to the trial, AlphaMed's prosecution of its misappropriation of trade secrets claim was fatally flawed because it provided no evidence by which a reasonable jury could establish actual damage to AlphaMed, unjust enrichment to Arriva and Spinelli, or a reasonable royalty for the value of AlphaMed's trade secret documents. *See Perdue Farms Inc. v. Hook*, 777 So.2d 1047, 1052 (Fla. 2d DCA 2001) ("'The plaintiff fulfills its burden of proving damages by showing the misappropriation, the subsequent commercial use, and introduces evidence by which the jury can value the rights the defendant has obtained.'")(quoting *University Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 545 (5th Cir.1974)); Milgrim on Trade Secrets § 15.01 ("It is fundamental that even if defendant's actual or threatened wrongful use is established, plaintiff must nonetheless establish that such use is to plaintiff's detriment.").

■ AlphaMed insists that it was under no burden to prove damages, and that, consistent with the Court's pretrial Order [D.E. 688], it was entitled to maintain a claim for nominal damages. To be sure, Florida law does permit the award of nominal damages "when the breach of an agreement or invasion of a right is established, since the law infers some damage to the injured party, where there is insufficient evidence presented to ascertain the particular amount of loss, the award of

---

**30.** Other states to adopt the UTSA are in accord. *See e.g., In re Hercules Automotive Products. Inc.*, 245 B.R. 903, 913 (Bankr. M.D.Ga.1999) ("Pursuant to ... [Georgia's codification of the UTSA] the remedies provided by the Act for misappropriation of a trade secret are exclusive. Thus, Trustee's only remedy for the alleged misappropriation of Debtor's customer base would either be a suit in equity for injunctive relief under O.C.G.A. § 10–1–762, or an action for damages under O.C.G.A. § 10–1–763.")

**31.** AlphaMed was required to state a claim for either injunctive relief or damages in order to assert standing to bring its misappropriation claim under Article III of the United States Constitution. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (holding that one of the three foundational requisites to Article III standing is that "it must be likely, as opposed to merely speculative, that the [complained of] injury will be redressed by a favorable decision.")

nominal damages is proper." *Beverage Canners, Inc. v. Cott Corp.,* 372 So.2d 954, 956 (Fla. 3d DCA 1979) (citing *Price v. Southern Home Ins. Co. of Carolinas,* 100 Fla. 338, 129 So. 748 (1930) and 9A Fla. Jur., Damages § 7–8). The FUTSA, however, is not a common law cause of action where the law allows a court to infer some damage to the complaining party. Rather, AlphaMed's cause of action for misappropriation of trade secrets is statutorily created, and therefore the question of whether AlphaMed may obtain an award of nominal damages is governed by the FUTSA.

On the subject of statutory construction, AlphaMed contends that "the legislature's decision to forgo mention of damages in the definition of 'misappropriation' [in Fla. Stat. § 688.002] in fact evidences that it specifically intended to exclude damages as an element of a prima facie claim for misappropriation." [D.E. 952 at 4]. AlphaMed seizes on the seemingly permissive language of the quoted statute to emphasize that "Section 688.004 simply sets forth the damages that *may* be available to a complainant; *nowhere* does the Florida UTSA state that a complainant must prove damages in order to maintain its claim." [*Id.*](emphasis in original).

Upon careful reflection of Spinelli's renewed arguments on this point, and contrary to the opinion expressed in the August 23, 2005 Order [D.E. 688 at 13], the undersigned concludes that AlphaMed's reading of the statute to permit the award of nominal damages does not withstand scrutiny. First, AlphaMed's argument that damages are not an element of a misappropriation claim because Section 688.002, in particular, does not reference damages, is unavailing. "It is axiomatic that all parts of a statute must be read

together in order to achieve a consistent whole.... Where possible, courts must give full effect to all statutory provisions and construe related statutory provisions in harmony with one another." *Forsythe v. Longboat Key Beach Erosion Control Dist.,* 604 So.2d 452, 455 (Fla.1992) (internal citations omitted). The Florida legislature enacted a provision to govern the award of damages under the FUTSA. In order to defend its ability to sustain an action for nominal damages, AlphaMed must present a plausible interpretation of the FUTSA as a whole, not cherry pick subsections and improperly read them in a vacuum.

Turning to the plain language of the FUTSA's express damages provision, "[i]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). This principle, commonly known by the Latin maxim, *expressio unius est exclusio alterius,*[32] is directly applicable here. *See generally, Shotz v. City of Plantation, Fla.,* 344 F.3d 1161, 1171 n. 15 (11th Cir.2003) (explaining the maxim). The FUTSA specifically provides for the types of damages recoverable in a claim for misappropriation of trade secrets: actual loss and unjust enrichment, *or, in their absence, a reasonable royalty.* The effect of this section is to limit the species of monetary remedies available to a plaintiff, and to call out clearly what damages are recoverable in the absence of actual loss or unjust enrichment. To hold that the FUTSA permits the recovery of nominal damages, in the absence of any statutory language autho-

---

**32.** *Expressio unius est exclusio alterius* is literally translated to mean that the expression of one thing is the exclusion of another.

rizing such an award, renders the inclusion of an explicit damages provision in the act meaningless. *Warner v. City of Boca Raton*, 887 So.2d 1023, 1033 n. 9 (Fla.2004) ("a statutory provision should not be construed in such a way that it renders the statute meaningless or leads to absurd results.") (citing *Palm Beach County Canvassing Bd. v. Harris*, 772 So.2d 1273 (Fla. 2000)).

Furthermore, the specific inclusion of three categories of damage evidences the legislature's intent to exclude other potential remedies, including nominal damages. It is clear that there are instances in which the Florida legislature will specifically provide for the award of "nominal damages" in other contexts. *See, e.g.,* Fla. Stat. § 772.11 (providing that victim of theft may state a claim for "minimum damages in the amount of $200"); Fla. Stat. § 720.303(5)(b) (member of a homeowner's association may maintain an action to recover actual or "minimum damages" for association's willful failure to maintain records and to make records available for inspection and copying). In light of these other statutory provisions authorizing awards of "minimum damages," the legislature's decision to not provide such a remedy for misappropriation claims is compelling.

Finding that a claim for damages under the FUTSA requires proof of damages is also consistent with decisions of other courts interpreting sister states' codifications of the UTSA.[33] *See Unilogic, Inc. v. Burroughs Corp.*, 10 Cal.App.4th 612, 12 Cal.Rptr.2d 741 (1992) (judgment of nonsuit affirmed where trade secret owner admitted it suffered no loss and failed to introduce competent evidence of unjust enrichment or reasonable royalty); *Litton Systems, Inc. v. Ssangyong Cement Indus.*

*Co., Ltd.,* 107 F.3d 30, 1997 WL 59360, *8 (Fed.Cir.1997) ("Failure to produce evidence of actual loss, unjust enrichment, or a reasonable royalty results in the assessment of zero damages under California law."); *FAS Technologies, Ltd. v. Dainippon Screen Mfg. Co., Ltd.,* 2001 U.S. Dist. LEXIS 7503, *11–12, 2001 WL 637451, *3–4 (N.D.Cal. May 31, 2001) ("the Court's conclusion that no reasonable trier of fact could find that FAS was damaged or Screen unjustly enriched, and that no injunctive relief is appropriate, disposes of FAS's misappropriation claim in its entirety."); *News Am. Mktg. In–Store, Inc. v. Marquis,* 86 Conn.App. 527, 862 A.2d 837, 846 (2004) (affirming trial court's determination that plaintiff did not meet its "burden of proving actual harm resulting from ... [defendant's] alleged violation of the trade secrets act."); *Liebert Corp. v. Mazur,* 357 Ill.App.3d 265, 293 Ill.Dec. 28, 827 N.E.2d 909, 925 (2005)(misappropriation of trade secret claim requires proof that "a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation.") (citation omitted); *Storage Technology Corp. v. Cisco Systems, Inc.,* 2003 U.S. Dist. LEXIS 17347, 2003 WL 22231544 (D.Minn. Sept.25, 2003), *aff'd,* 395 F.3d 921 (8th Cir.2005).

Louisiana, which limits damages under its codification of the UTSA to actual loss or unjust enrichment, *see* La.Rev.Stat. Ann. § 51:1433, similarly requires a plaintiff to prove "(1) the existence of a trade secret, (2) a misappropriation of the trade secret, and (3) actual loss caused by the misappropriation." *Tubos de Acero de Mexico, S.A. v. Am. Intern. Inv. Corp., Inc.,* 292 F.3d 471, 483 (5th Cir.2002) (quoting *Reingold v. Swiftships, Inc.,* 126

---

**33.** The FUTSA "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this act among states enacting it." Fla. Stat. § 688.009.

F.3d 645, 648 (5th Cir.1997)). *See also Omnitech Intern., Inc. v. Clorox Co.*, 11 F.3d 1316, 1323 n. 10 (5th Cir.1994) (establishing that a plaintiff must prove "(i) the existence of a legally protectable trade secret, (ii) misappropriation of the trade secret, and (iii) damages resulting therefrom"); *Am. Mach. Movers Inc. v. Mach. Movers of New Orleans, LLC*, 136 F.Supp.2d 599, 602 (E.D.La.2001) (rejecting claim for misappropriation of trade secrets "because the plaintiff has failed to provide evidence of any damage resulting from the claimed trade secret infraction"), *aff'd*, 34 Fed.Appx. 150 (5th Cir.2002).[34]

In response, AlphaMed is unable to cite any authority for its position that under Florida law (or the law of any jurisdiction adopting the UTSA) a court has held that a plaintiff may maintain a claim for misappropriation of trade secrets without presenting evidence of damage or a claim for injunctive relief.[35] *See A.L. Labs., Inc. v. Philips Roxane, Inc.*, 803 F.2d 378 (8th Cir.1986) (applying pre-UTSA Missouri law which did not limit a plaintiff to certain specific damages in connection with a trade secret claim); *GME Inc. v. Carter*, 128 Idaho 597, 917 P.2d 754 (1996) (plaintiff was awarded nominal damages in addition to injunctive relief); *Becker Equipment, Inc. v. Flynn*, 2004 Ohio App. LEXIS 1053, 2004 WL 486219 (Ohio Ct. App. Mar. 15, 2004) (plaintiff did not seek award of affirmative damages, rather, award of nominal damages made by jury). The clear weight of authority mandating proof of damages under the UTSA, and the limited support for AlphaMed's position that such proof is not required, strongly militate in favor of granting Spinelli's Motion.

---

**34.** Texas, where misappropriation of trade secrets is a common law tort based on the Restatement of Torts, § 757, also requires proof of damages. *Carbo Ceramics, Inc. v. Keefe*, 2006 U.S.App. LEXIS 1995, *27, 2006 WL 197340, *9 (5th Cir. Jan.26, 2006) ("Because Carbo has failed to meet its burden of presenting sufficient evidence demonstrating a triable issue of material fact as to actual damages recoverable under its trade secret misappropriation claim, we affirm the district court's grant of summary judgment as to that claim."); *Propulsion Techs., Inc. v. Attwood Corp.*, 369 F.3d 896, 905 (5th Cir.2004) (finding that Plaintiff failed to present "evidence of damages ... from the use of confidential designs sufficient to sustain a damage award"); *Alcatel USA. Inc. v. Cisco Sys.*, 239 F.Supp.2d 660, 672 (E.D.Tex.2002) (granting summary judgment on claim for misappropriation of a trade secret for lack of a remedy because plaintiff failed to meet its burden of proving damages).

**35.** Spinelli has effectively distinguished the three cases upon which the Court relied in holding that AlphaMed could maintain a claim for nominal damages [*see* D.E. 688 at 13]:

In *Scott v. Dixie Homecrafters*, 125 F.Supp.2d 1311 (M.D.Ala.2000), the plaintiff brought suit for common law breach of contract and misrepresentation and was not operating under a statute, such as the UTSA, limiting the available remedies. In *Intermedics, Inc. v. Ventritex, Inc.*, 822 F.Supp. 634, 658–9 (N.D.Cal.1993) the question before the court was when does the statute of limitations begin to run in a UTSA claim and did not involve the issue of whether the plaintiff could proceed to a jury without proving actual damages, unjust enrichment or a reasonable royalty. The court simply held that the cause of action begins to accrue upon misappropriation, rejecting pre-UTSA cases holding that the cause of action accrues only upon the occurrence of appreciable and actual harm, rather than nominal damages. Finally, in *Caterpillar, Inc. v. Sturman Industries, Inc.*, 387 F.3d 1358, 1360 (Fed.Cir.2005), the court permitted the plaintiff in a UTSA claim to seek a full award of damages from the jury, but the jury awarded only nominal damages of $1.00 as well as significant unjust enrichment damages. Conversely, in this case, AlphaMed has failed to prove any recoverable damages, meaning that even the $1.00 nominal damage verdict should not stand.

[D.E. 928 at 5–6].

Finally, AlphaMed argues in the alternative that evidence about the value of its trade secrets was presented by Darren Lezdey. [D.E. 928 at 11–12 citing T.R. Vol. 2 at 113–114]. This argument does not persuade. Neither this testimony, nor any evidence presented in the case, alters the Court's pre-trial conclusion that AlphaMed presented no evidence by which the jury could value its damages relating to misappropriation of trade secrets. Review of the cited testimony reflects that Darren Lezdey referred, in very general terms, to the effort that went into developing AlphaMed's business plan. Nothing that Darren Lezdey said could be fairly characterized as an attempt to quantify an actual loss, unjust enrichment, or a reasonable royalty related to the misappropriation of AlphaMed's trade secrets.

### B. Arriva's Motion for Judgment as a Matter of Law

#### (1) The Standard: AlphaMed's Burden to Prove Lost Profit Damages with Reasonable Certainty

[11] Under Florida law, "[t]he general rule is that anticipated profits of a commercial business are too speculative and dependent upon changing circumstances to warrant a judgment for their loss." *Levitt–ANSCA Towne Park Partnership v. Smith & Co., Inc.*, 873 So.2d 392, 396 (Fla. 4th DCA 2004) (quoting *Massey–Ferguson, Inc. v. Santa Rosa Tractor Co.*, 415 So.2d 865, 867 (Fla. 1st DCA 1982); *Fu*

*Sheng Indus. Co., Ltd. v. T/F Systems, Inc.*, 690 So.2d 617, 622 (Fla. 4th DCA 1997)). Nonetheless, a plaintiff may obtain this generally disfavored form of relief by presenting sufficient evidence " 'to determine damages for lost profits with a reasonable degree of certainty, rather than by means of speculation and conjecture.' " *Cibran Enterprises, Inc. v. BP Products N. Am., Inc.*, 365 F.Supp.2d 1241, 1254 n. 2 (S.D.Fla.2005) (quoting *Himes v. Brown & Co. Sec. Corp.*, 518 So.2d 937, 938 (Fla. 3d DCA 1987)); *HGI Associates, Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 879 (11th Cir.2005)(quoting *Sostchin v. Doll Enters., Inc.*, 847 So.2d 1123, 1128 (Fla. 3d DCA 2003)).

Under the traditional "new business rule," start-up companies—such as AlphaMed—were unable to satisfy this "reasonable certainty" test as a matter of law. *See, e.g., Central Coal & Coke Co. v. Hartman*, 111 F. 96, 98–99 (8th Cir.1901) ("the loss of profits from the destruction or interruption of an established business may be recovered where the plaintiff makes it reasonably certain by competent proof what the amount of his loss actually was. . . . He who is prevented from embarking in a new business can recover no profits, because there are no provable data of past business from which the fact that anticipated profits would have been realized can be legally deduced.").

A majority of jurisdictions has now abandoned strict application of the rule [36] and holds that a plaintiff's status as

---

**36.** The "new business" rule continues to be applied as an absolute bar to recovery in a minority of jurisdictions. *See, e.g., Lowe's Home Centers, Inc. v. General Elec. Co.*, 381 F.3d 1091, 1096 (11th Cir.2004) (observing that under Georgia law "[l]ost profits are generally unavailable to new businesses which lack ... a track record") (citation omitted); *Kinesoft Development Corp. v. Softbank Holdings Inc.*, 139 F.Supp.2d 869, 908 (N.D.Ill. 2001) ("Under Illinois law, a new business, or

an existing business with a new product, cannot recover lost profits because the future profits of a new business cannot be ascertained with any degree of certainty.") (citation omitted); *Sambo's of Ohio, Inc. v. City Council of Toledo*, 466 F.Supp. 177, 181 (N.D.Ohio 1979) ("The law is well established that loss of profits from a new business enterprise is too speculative to be allowed as an element of damage. Only where the evidence establishes a history of profitable operations,

a new or unestablished business will not automatically preclude the recovery of lost profit damages. *See* Robert L. Dunn, Recovery of Lost Profits § 4.3 (6th ed.2005)(collecting cases). AlphaMed is correct, and the undersigned has previously recognized, that Florida is among those jurisdictions which permit "a party to prove lost future business even without a 'track record.'" *Air Caledonie Intern. v. AAR Parts Trading, Inc.*, 315 F.Supp.2d 1319, 1343 (S.D.Fla.2004); *but see Brevard County Fair Ass'n, Inc. v. Cocoa Expo, Inc.*, 832 So.2d 147, 152–153 (Fla. 5th DCA 2002) (holding that "a condition precedent to recovery [of lost profit damages] is proof by competent substantial evidence that the business has earned profits for a reasonable time before the occurrence of the wrong.") (citing *Forest's Mens Shop v. Schmidt*, 536 So.2d 334, 335 (Fla.4th DCA 1988); *Daytona Migi of Jacksonville, Inc. v. Daytona Auto. Fiberglass, Inc.*, 388 So.2d 228, 232 (Fla. 5th DCA 1980)). In such cases, "the party must prove both (1) that the defendant's action caused the damage, and (2) that there is some standard by which the amount of damages may be adequately determined." *Air Caledonie Intern.*, 315 F.Supp.2d at 1343 (citing *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So.2d 1348, 1351 (Fla.1989)).

In those jurisdictions that have abandoned the "new business rule," however, "[w]hat was once a rule of law has been converted into a rule of evidence," subjecting lost profit claims from new businesses to more stringent review than similar claims from established businesses with a track record of generating profits. *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir.2000) (explaining that under New York law "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate") (citation omitted); *Tipton v. Mill Creek Gravel, Inc.*, 373 F.3d 913, 918 (8th Cir.2004) ("new businesses 'labor[ ] under a greater burden of proof in overcoming the general rule that evidence of expected profits is too speculative, uncertain, and remote to be considered.'") (quoting *Handi Caddy, Inc. v. Am. Home Products Corp.*, 557 F.2d 136, 139 (8th Cir.1977)); Robert L. Dunn, Recovery of Lost Profits § 4.3 (6th ed.2005); Restatement (Second) of Torts § 912 cmt. d (1977) ("Because of a justifiable doubt as to the success of new and untried enterprises, more specific evidence of their probable profits is required than when the claim is for harm to an established business.").

The rationale for applying heightened skepticism to new businesses' claims of lost profits is clear: the commercial success of a new venture should be determined in the marketplace, not in the courtroom. An endorsement of the alternative would permit start-up corporations to reap unearned profits without bearing the costs and risks that every other entrepreneur must shoulder. To avoid this result, even courts that have abandoned the "new business" rule routinely reject lost profit claims from unestablished businesses. *See, e.g., North Dade Cmty. Dev. Corp. v. Dinner's Place, Inc.*, 827 So.2d 352 (Fla. 3d DCA 2002); *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 280 (Tex.1994) ("the fact that a business is new is but one consideration in applying the 'reasonable certainty' test"); *Hunters Int'l Mfg. Corp. v. Christiana Metals Corp.*, 561 F.Supp. 614, 617 (E.D.Mich.1982) (more difficult to prove lost profits for "an enterprise venturing into a new industry or method" because of

followed by the actionable wrong and a diminution of profits, can there be any recovery.")

(citing *McBrayer v. Teckla, Inc.*, 496 F.2d 122 (5th Cir.1974)).

"paucity of proofs and the lack of similar businesses in the area from which to estimate profits"); *Drews Co., Inc. v. Ledwith–Wolfe Associates, Inc.,* 296 S.C. 207, 371 S.E.2d 532 (1988); *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin,* 247 Conn. 48, 717 A.2d 724, 733–35 (1998); *Hillside Enterprises v. Carlisle Corp.,* 69 F.3d 1410 (8th Cir.1995). *See also TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732 (10th Cir.1993) (declining to determine whether Oklahoma law recognizes "new business" rule because lost profit claim failed whether or not the rule was applied).

Writing for the Seventh Circuit, Judge Posner articulated a frequently cited approach to the assessment of lost profit claims from unestablished businesses—especially those that launch untested products or operate in uncertain commercial environments—in the wake of the demise of the "new business" rule:

> Abrogation of the 'new business' rule does not produce a free-for-all. What makes MindGames' claim of lost royalties indeed dubious is not any "new business" rule but the fact that the success of a board game, like that of a book or movie, is so uncertain. Here newness enters into judicial consideration of the damages claim not as a rule but as a factor in applying the standard. Just as a start-up company should not be permitted to obtain pie-in-the-sky damages upon allegations that it was snuffed out before it could begin to operate ... capitalizing fantasized earnings into a huge present value sought as damages, so a novice writer should not be permitted to obtain damages from his publisher on the premise that but for the latter's

laxity he would have had a bestseller, when only a tiny fraction of new books achieve that success.

*MindGames, Inc. v. Western Pub. Co., Inc.,* 218 F.3d 652, 658 (7th Cir.2000). Analogized to the damages claim of the hypothetical "novice writer," the Seventh Circuit rejected the lost profits claim of the makers of a board game as unduly speculative based in part on the fact that the profits relied on the "fickle" preferences of the consuming public.[37] *Id.*

The *MindGames* court emphasized that "[d]amages must be proved, and not just dreamed, although 'some degree of speculation is permissible in computing damages, because reasonable doubts as to remedy ought to be resolved against the wrongdoer.' " *Id.* (quoting *Jones Motor Co., Inc. v. Holtkamp, Liese, Beckemeier & Childress,* 197 F.3d 1190, 1194 (7th Cir. 1999)). AlphaMed seizes on the final part of this quoted standard in an attempt to temper what it fears is an unduly burdensome standard under which it, as a new business operating in the unpredictable field of biotechnology, must demonstrate entitlement to lost profits.

> Arriva's contention that damages are too speculative because there is no way of adequately predicting FDA approval [of AlphaMed's proposed recombinant AAT product] is absurd because no one can ever guarantee FDA approval. If Arriva's argument is accepted then there never is any recourse to a start-up biotechnology company for a competitor's tortious interference. Like in this case, a large competitor could act anti-competitively with impunity to destroy a start-up, thereby undermining innova-

---

**37.** Some courts apply heightened scrutiny to lost profits claims from untested entertainment ventures because such claims are, by nature, subject "to the changing whims and artistic tastes of the general public." *Schonfeld,* 218 F.3d at 174; *see also, Proteus Books* *Ltd. v. Cherry Lane Music Co., Inc.,* 873 F.2d 502, 510 (2d Cir.1989) ("in the entertainment business ... there are 'inherent uncertainties predicting profits.' ") (internal citations omitted); *Hollywood Fantasy Corp. v. Gabor,* 151 F.3d 203 (5th Cir.1998).

tion and invention. This is the antithesis of the American system of capitalism. [D.E. 931 at 14]. Consistent with the "wrongdoer" principle quoted in *Mind-Games*, AlphaMed argues that any uncertainty relative to its proposed product's approval from the FDA (and thereby its lost profit claim) emanates from Defendants' conduct, and therefore Arriva should be made to bear the risk of that uncertainty.

As support for its position, AlphaMed quotes and relies on the leading decision establishing the "wrongdoer" principle, *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

*Id.,* accord, *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Lehrman v. Gulf Oil Corp.,* 500 F.2d 659 (5th Cir.1974); *G.M. Brod & Co., Inc. v. U.S. Home Corp.,* 759 F.2d 1526, 1540 (11th Cir.1985).

AlphaMed's argument is by no means unique. *Story Parchment* is "commonly invoked by courts allowing recovery of future lost profits by new or unestablished businesses." *Mid–Am. Tablewares, Inc. v. Mogi Trading Co., Ltd.,* 100 F.3d 1353, 1365–66 (7th Cir.1996). AlphaMed's reliance on *Story Parchment,* however, results in a blurring of the critical distinction that must be recognized between proof of the *fact* of damage and proof of the *amount* of damage. While *Story Parchment* and its progeny teach that a relaxed burden of proof should apply to the ascertainment of the *amount* of damage,[38] the plaintiff retains the burden of proof to a reasonable certainty that some damage occurred. As a leading treatise on the subject explains, "[i]f plaintiff's proof leaves uncertain whether plaintiff would have made any profits at all, there can be no recovery." Robert L. Dunn, Recovery of Lost Profits § 1.8 (6th ed.2005).

Courts routinely reject attempts to invoke *Story Parchment* to relax the burden of proof applicable to the fact of damage determination. *See e.g., R.S.E., Inc. v. Pennsy Supply, Inc.,* 523 F.Supp. 954, 965 (M.D.Pa.1981) (holding that "plaintiff's reliance on *Story Parchment* is totally inappropriate since the issue raised is causation of damages, not amount of damages."); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,* 175 F.3d 18, 33 (1st Cir.1999) ("The district court used the well-worn phrase from *Sto-*

---

38. Even that relaxed standard of proof requires the presentation of some evidence by which the jury may measure the amount of damage incurred. *Bigelow,* 327 U.S. at 264, 66 S.Ct. 574 ("In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork."); *Olympia Equip. Leasing Co. v.*

*W. Union Tel. Co.,* 797 F.2d 370, 383 (7th Cir.1986) ("[W]hen a small, inexperienced firm created largely to exploit opportunities to save taxes extrapolates a multi-million dollar future from a few months of success, courts must be on guard against the more than possibility that the extrapolation ignores economic reality.").

*ry Parchment* outside of its normal context—a trial encompassing both liability and damages—where the phrase is usually thought to mean only that an antitrust plaintiff need not 'establish the amount of damages with mathematical precision.' . . . It is one thing to say there needs to be some flexibility in proving the amount of damages relating to hypothetical events. Such flexibility is needed both in practical terms given the nature of the proof, and to avoid rewarding a wrongdoer for its misconduct. It is quite another thing to suggest that an antitrust plaintiff does not need to show probability that the damages caused by the wrongdoer's misconduct fall within a reasonably estimated range of damages.") (quotation omitted); *Gandal v. Telemundo Group, Inc.*, 23 F.3d 539, 547 (D.C.Cir.1994) ("The trouble with the district court's damage award is that its inability to determine the value of the junk bond with ease and precision not only raises uncertainty as to the exact amount of damages, that inability also creates doubt as to whether a legal injury actually occurred.").

As the *Story Parchment* court held,
there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.

282 U.S. at 562, 51 S.Ct. 248; *accord, Yoder Bros., Inc. v. Cal.-Fla. Plant Corp.*, 537 F.2d 1347, 1371 n. 24 (5th Cir.1976) ("The standard of proof needed to establish fact of damage is significantly different than that for amount of damage. . . . From this, the courts have inferred that a stricter standard of proof is necessary for fact of damage than for amount of damage."); *Twyman v. Roell*, 123 Fla. 2, 166 So. 215, 218 (1936) ("uncertainty which defeats recovery in such cases has reference to the cause of the damage rather than to the amount of it"); *Typographical Serv., Inc. v. Itek Corp.*, 721 F.2d 1317, 1319–20 (11th Cir.1983) (noting that "courts require more certainty in showing that lost profits flowed from the alleged wrongful conduct" than in proving the amount of those profits); *Schonfeld*, 218 F.3d at 175 ("The [wrongdoer] rule does not apply here for the simple reason that the existence of lost profit damages cannot be established with the requisite certainty."); *U.S. Football League v. National Football League*, 842 F.2d 1335, 1379 (2d Cir.1988) ("The Supreme Court's decisions in *Bigelow* and *Story Parchment* thus do not shift the burden of proving the cause of damages from the plaintiff to the defendant. They simply restate the established principle that where damages have been shown to be attributable to the defendant's wrongful conduct, but are uncertain in amount, the defendant bears the risk of those uncertainties."); *Thompson v. Haynes*, 305 F.3d 1369, 1382 (Fed.Cir. 2002) (recognizing "a distinction between proof of the fact of damages, which must be established with at least reasonable certainty, and the amount of damages, which may be estimated, provided it is not merely speculative."); *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C.Cir.1997) (same).

By misreading *Story Parchment* and its distinction between the burden of proof relative to the fact of damage and the burden with respect to the amount of damage, AlphaMed improperly attempts to shift the burden of proof to the "wrongdoer" on both distinct elements of the inquiry. This result is wholly inconsistent with the reasonable certainty standard "because it is nearly always the case that

the alleged wrongdoer's conduct alters the plaintiff's future course of dealing and therefore prevents lost profits from being readily ascertainable[.][T]he standard in such cases cannot be that the reasonable certainty requirement is relaxed, otherwise that exception would swallow the rule." *Kidder, Peabody & Co., Inc. v. IAG Intern. Acceptance Group N.V.,* 28 F.Supp.2d 126, 137 (S.D.N.Y.1998).

■ Proper reliance on *Story Parchment* dictates that AlphaMed was not required to prove its expert's damage calculation of $79.5 million to a reasonable certainty. A non-speculative estimation, grounded in economic realities, was sufficient to justify the amount of the award. AlphaMed was not, however, relieved from its burden to prove to a reasonable certainty that it would have earned a profit (of some amount) but for Defendants' conduct. AlphaMed's failure to have done so presents a fatal problem with respect to the requisite first prong of the lost profits inquiry under Florida law—proof that "the defendant's action caused the damage." *W.W. Gay Mech. Contractor, Inc.,* 545 So.2d at 1351.

 (2) *AlphaMed Presented Insufficient Evidence for a Reasonable Jury to Determine to a Reasonable Certainty that Arriva's Conduct was the Cause of AlphaMed's Purported Lost Profit Damage.*

■ To sustain the verdict in its favor, AlphaMed was required to prove that its failure to generate expected profits (or any profits) was caused by Arriva's conduct. Under Florida law, recoverable damages include "all damages which are a natural, proximate, probable or direct consequence of the act, but do not include remote consequences." *Taylor Imp. Motors, Inc. v. Smiley,* 143 So.2d 66, 67–68 (Fla.3d DCA 1962); *Douglass Fertilizers & Chem., Inc. v. McClung Landscaping, Inc.,* 459 So.2d 335 (Fla. 5th DCA 1984); *Royal Typewriter Co. v. Xerographic Supplies Corp.,* 719 F.2d 1092, 1105(11th Cir.1983) (citing *Aldon Indus., Inc. v. Don Myers & Associates, Inc.,* 517 F.2d 188, 191 (5th Cir. 1975)). "Life is too short to pursue every human act to its most remote consequences; 'for want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause of action against a blacksmith." [39] *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 287, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (Scalia, J., concurring). *See also Halliburton Co. v. Eastern Cement Corp.,* 672 So.2d 844, 846 (Fla. 4th DCA 1996) ("the cause for any contemporary event can, if one is inclined to do so, be connected in a seemingly logical chain of circumstances and occurrences all the way back to creation.").

AlphaMed's attempt to link its failure to generate profits to Arriva's conduct is hampered by a temporal problem. The facts establish that AlphaMed's business was faltering in late 2000, demonstrated by the company's inability to pay its licensing

---

**39.**
 Although not authoritative, Poor Richards Almanac (1758) is illustrative: 'For want of a nail the shoe was lost; For want of a shoe the horse was lost; And for want of a horse the rider was lost; For the want of a rider the battle was lost; For want of a battle the kingdom was lost; And all for the want of a horseshoe-nail.' The court would have little difficulty in submitting the loss of the shoe, the horse, and probably the rider to a jury if caused by the sale of a defective nail or the failure to deliver the nail as agreed. The loss of the battle creates a doubtful question, but the loss of the kingdom is so remote as to bar its submission to a jury. *Ohoud Establishment for Trade & Contracts v. Tri–State Contracting & Trading Corp.,* 523 F.Supp. 249, 255 (D.N.J.1981); *Sun Ins. Mktg. Network. v. AIG Life Ins. Co.,* 254 F.Supp.2d 1239, 1247–48 (M.D.Fla.2003) (same).

fees or fund its critical "proof of concept" research at the University of Nebraska.[40] Rather than use its existing capital to advance the research on its AAT product, AlphaMed allocated resources elsewhere—notably expending over $300,000 in legal fees on the Protease involuntary bankruptcy proceedings in Nevada. AlphaMed's significant financial difficulty actually preceded Arriva's interference with Williams by several months. In spite of this fact, AlphaMed asserts that had Williams made a significant investment in AlphaMed in the spring of 2001 (as he had planned to do before Arriva's interference), AlphaMed would have repaid its debt to the University of Nebraska and restarted its research and purification work.[41] AlphaMed would then have capitalized on the University's positive results to attract large institutional investors, enabling it to take advantage of its "window of opportunity" and reap enormous profits.

To prove this lost profits theory, AlphaMed locked itself into proving to a reasonable certainty that Williams' investment of $750,000–$1.5 million was the single missing ingredient in an otherwise profitable strategy. Arriva argues otherwise, noting that the chain of causation tying Arriva's conduct to AlphaMed's injury is too attenuated and fragile, linked only by a series of unproven, unsustainable assumptions.

Like the "tiny fraction of new books" that become bestsellers, *MindGames*, 218 F.3d at 658, only a minuscule percentage of drugs in development ever reaches the commercial market—and of those, only a subset ever prove profitable for their manufacturer.[42] [*See* Defs.' Ex. 352—V. Walter Bratic, Patricia Tilton & Mira Balakrishnan, *Navigating Through a Biotech Valuation* (Working paper, PricewaterhouseCoopers LLC) ("in the drug development and approval process, only one in five thousand compounds that enter pre-clinical testing make it to human testing, and then only one in five are [sic] approved. Of those products which are approved, few biotechnology products which reach the market generate sufficient return to cover their cost.") ]. Accordingly, reliance on a multitude of assumptions is endemic to any valuation of the prospective profitability of new pharmaceutical products. [*See id.* ("Numerous questions exist which are impossible to answer with certainty. Will the product work? Will the product be approved? Will there be a market for the product? How long will it take to get the product to market? Will the regulatory process undergo change? How will the market change during a lengthy development and testing process? Can the company obtain the resources to survive over this time? Will the technology be valuable ten to twenty years in the future? There are no definitive answers to these questions; only forecasts, estimates, projections and pure guesses.") ].

40. AlphaMed acknowledged in its Private Placement Memorandum that "[t]he company has had a limited operating history and as of March 31, 2001 has incurred cumulative operating losses of approximately $611,000 since its inception in July, 1999." [T.R. Vol. 6 at 93, ll. 21–24].

41. Whether Williams would have actually made an investment in AlphaMed absent Special Agent Conner's contact and whether AlphaMed would have used Williams' investment to further its "proof of concept" research at the University of Nebraska were disputed issues of fact at trial. AlphaMed presented sufficient evidence to support the jury's findings on each of these issues.

42. The jury, in fact, explicitly rejected AlphaMed's assumption that it would have obtained FDA approval for its prescription AAT product by the year 2005. [D.E. 867 (Special Interrogatory No. 28(g)) at 2].

This inherent uncertainty makes the recovery of lost profits for anticipated sales of a new drug exceedingly difficult. For example, in the case of *Microbix Biosystems, Inc. v. Biowhittaker, Inc.*, 172 F.Supp.2d 680, 698 (D.Md.2000), *aff'd*, 11 Fed.Appx. 279 (4th Cir.2001), the court rejected a claim for lost profits based on the anticipated sales of a serine protease pharmaceutical product as "too speculative." [43] *Id.* The court observed that

> [a]ccording to the Plaintiff's expert's testimony, the estimated lost future profits are based, in large part, upon the anticipated future profits from the sales of urokinase. However, in claiming lost future profits, Plaintiff ignores the fact that it has not yet completed all the requisite tasks for bringing the urokinase product to market. In other words, for the damages to be of the amount claimed (or any amount for that matter), one must assume that Plaintiff would have successfully secured a manufacturing facility, obtained FDA approval, developed the urokinase in commercial quantities, and marketed the product during the relevant time frame. However, the evidence does not permit a finding that these tasks would have been completed prior to the occurrence of the other intervening factors that severed any chain of causation.

Arriva contends that AlphaMed's claim—linking Arriva's conduct to AlphaMed's alleged lost profit damages—is contingent on the validity of an even long-er list of assumptions upon which the AlphaMed business plan was predicated:

a. AlphaMed's antimicrobial product line would be immediately profitable and would substantially finance AlphaMed's pharmaceutical product lines;

b. The sale of consumer-ready rAAT [recombinant AAT] products without FDA approval is legal in the United States;

c. AlphaMed did not need FDA approval to sell its proposed veterinary rAAT product line in the United States;

d. AlphaMed had a reasonable chance of completing clinical trials and obtaining FDA approval in the United States for its rAAT products in a five-year period;

e. AlphaMed could satisfy the applicable regulatory requirements necessary for the sale of rAAT products abroad;

f. AlphaMed's development stage, yeast-derived recombinant protein AAT products would be safe and effective;

. . .

g. AlphaMed had the patent rights to sell rAAT products in the United States and Europe. . . .

h. AlphaMed's initial target market for its rAAT product line was non-patent countries, i.e. countries other than the United States and Europe; and

i. AlphaMed could raise the funds necessary to do the research and development to obtain the necessary regulatory

---

**43.** AlphaMed argues that "damages are fact specific" and faults Arriva for not identifying any cases in which a lost profits claim was rejected in the "bio-pharm" industry. [Tr. of Or. Arg. at 73, ll. 23–25.] This argument only undermines AlphaMed's position as it, conversely, has not cited any authority in which a lost profits claim in the bio-pharm industry has succeeded. While there is a dearth of published caselaw analyzing analogous facts, the only authority identified by the Court, *Microbix Biosystems, Inc.*, strongly validates

Arriva's position. Moreover, the commercial viability of products upon which the rejected lost profit claims were based in the cases cited by Arriva (aircraft engines in *Air Caledonie Intern.*; typewriters in *Royal Typewriter Co.*; a cable network in *Schonfeld*; hand-held bar code scanners for use in grocery stores in *Telxon Corp. v. Smart Media of Del., Inc.*, 2005 Ohio App. LEXIS 4475, 2005 WL 2292800 (Ohio App. 9th Dist. Sept. 21, 2005)), was substantially less speculative than AlphaMed's proposed bio-pharmaceutical product.

approvals to bring its recombinant AAT products to market.

[D.E. 947 at 8.]

As Arriva thoroughly explains in its briefing on the issue, AlphaMed failed to produce competent or admissible evidence to prove any of these assumptions to a reasonable certainty. As noted, "[t]he fact that damages occurred must be shown with at least reasonable certainty. Whether the individual "but for" assumptions could be accepted by a reasonable person is one question. Whether the entire scenario could be accepted by a reasonable person as being reasonably certain is another question." *Resolution Trust Corp. v. Stroock & Stroock & Lavan,* 853 F.Supp. 1422, 1429 (S.D.Fla.1994). Far from demonstrating that each of AlphaMed's "but for" assumptions was established, however, the evidence introduced at trial demonstrated conclusively that many of these assumptions were demonstrably false, prohibited by law or, at the very least, speculative. For example:

• As noted above, *supra* n. 17, AlphaMed relied on generating revenue from its antimicrobial division to fund the other aspects of its business plan. [T.R. Vol. 6 at 111, ll. 15–19 ("The future success of the company depends not only on the amount of capital raised in this offering and other

planned subsequent offerings, but also on its ability to generate sales of its disinfectant [antimicrobial] products in quantities sufficient to generate profits.")(quoting AlphaMed's Private Placement Memorandum)]. Jarett Lezdey also admitted that the financial success of the company depended, in part, on the antimicrobial division generating profits. [T.R. Vol. 16 at 78–82]. However, AlphaMed never came "anywhere near meeting" its goals during the time frame relevant to this litigation. [*Id.* at 82, ll. 7–11].

• AlphaMed was prohibited by federal law from selling products containing rAAT as a treatment for human or animal use without FDA approval.[44] A key component of AlphaMed's business plan, however, was to do just that—initially target what it assumed to be unregulated uses for rAAT in the United States (including veterinary and cosmetic uses). [Pl.'s Ex. 113.03 at ALPHAMED 003428 ("For early revenues prior to FDA approval, AlphaMed will first target non-FDA regulated topical medications for the treatment of skin, ear, and eye inflammation in humans and in animals.")]. Beyond the conclusory assertions of its principals,[45] AlphaMed never presented evidence that this portion of its

---

44. *See* 42 U.S.C. § 262(a) (prohibiting the sale of "biological products" without a biologies license issued by the FDA); 21 C.F.R. § 601.2(a)(4) (establishing that therapeutic Recombinant DNA-derived products are biological products); 21 U.S.C. § 355(a) (prohibiting the sale of any new drug unless approved by the FDA); 21 U.S.C. § 360b(a) (prohibiting the sale of any new animal drug unless approved by the FDA); 21 U.S.C. § 321(p)(1) (defining "new drug" for humans); 21 U.S.C. § 321(v)(1) (defining "new animal drug"). Arriva's expert witness, Dr. Barbara Matthews, testified that it would be illegal for AlphaMed to sell rAAT in the Unit-

ed States without FDA approval. [T.R. Vol. 31 at 183–87].

45. Darren Lezdey testified that AlphaMed believed that it "wouldn't have had to have gone through all the FDA hurdles" to reach these initial markets. [T.R. Vol. 3 at 50, ll. 14–15]. He further elaborated that "[t]here is a whole holistic type of movement out there and that, that type of industry has just boomed over the last decade and that's what we were interested in doing, in moving forward with animals and humans and try to get more, faster revenue into our company so, eventually, get our stuff FDA approved down the road." [*Id.* at 54, ll. 12–17].

business plan could be executed in accordance with the applicable law. A plaintiff's "self-serving assertion" is "precisely the type of evidence" that courts hold to be insufficient to establish lost profits. *Grantham & Mann, Inc. v. Am. Safety Prods., Inc.*, 831 F.2d 596, 603 (6th Cir.1987); *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 728–29 (5th Cir.1977) ("completely self-serving testimony, unsupported by other evidence and in the teeth of universal experience, will not support a jury verdict."). It is beyond dispute that AlphaMed cannot recover lost profits that are "predicated on the completion of illegal activity." *Carruthers v. Flaum*, 365 F.Supp.2d 448, 470 (S.D.N.Y.2005); *see also, Gillmor v. Wright*, 850 P.2d 431, 438 (Utah 1993) ("No legal damages flow from the inability to engage in an unlawful activity.").[46]

● AlphaMed contends that part of its business strategy called for it "to first market its products outside the United States in countries which do not require FDA approval ...." [D.E. 931 at 15]. For example, Darren Lezdey testified that "[o]ne of AlphaMed's strategies was to get our drug to market. Just like the United States, South America, South American people suffer from disease, too, and their FDA requirements aren't as rigid as ours." [T.R. Vol. 3 at 39, ll. 19–22]. Beyond this sort of generalized obser-

vation, however, AlphaMed offered no evidence that it had taken any concrete steps to execute this portion of its business plan. For example, AlphaMed presented no evidence that it was logistically prepared to distribute AAT abroad or that it had investigated the regulatory requirements (or business conditions) of the countries to which it intended to export. In fact, Arriva demonstrated on cross examination that Darren Lezdey was generally unaware of the regulatory requirements for distribution of drugs overseas. [T.R. Vol. 6 at 87–88].[47]

AlphaMed required significant funding in order to execute its business plan and realize any profit. In fact, AlphaMed estimated that, for research and development alone, it would require $609,500 in the fourth quarter of 2000, $5.1 million in 2001, and a total of $13.5 million through 2003. [Pl.'s Ex. 112 at App. A; T.R. Vol. 11 at 56–57 (Michael Weber acknowledged AlphaMed's research and development costs); *see also* T.R. Vol. 6 at 147–48 (Darren Lezdey acknowledged that AlphaMed needed $10 million in financing by the end of the fourth quarter of 2000 to meet the profit projections in its business plan)]. Thus, AlphaMed's admitted financial needs far exceeded William's planned investment. As demonstrated above, however, none of the revenue generating options that AlphaMed assumed would help fund the development of its FDA approved AAT product

---

**46.** Moreover, the jury expressly rejected this assumption. [D.E. 867(Special Interrogatory No. 28(c)) at 2].

**47.** As further evidence of AlphaMed's plan to sell AAT products overseas in an "unregulated environment," AlphaMed, at oral argument, directed the Court to Dr. Barr's cross examination [T.R. Vol. 29 at 154–161] in which he was questioned on the Arriva business plan's focus on foreign markets. This section of testimony, however, contains little discussion

of foreign markets. It only addresses, generally, the size of the potential global market for AAT products. [*Id.* at 158, ll. 5–10]. AlphaMed also points to Bratic's testimony [T.R. Vol. 25 at 89–91] wherein he testified about the potentially large global market for AAT products. Needless to say, neither reference does more than provide evidence of the existence of a global market. AlphaMed failed to provide any evidence that it had taken any action to avail itself of this market.

(sales of anti-microbial and unregulated AAT products) proved viable. The failure to capture any of the revenue anticipated by its business plan debunks AlphaMed's claim for lost profits. *See Royal Typewriter Co.*, 719 F.2d at 1105 (reversing jury verdict for lost profits because there was no evidence the plaintiff operated the business in accordance with its own financial projections).

In response to Arriva's enumeration of the assumptions that AlphaMed failed to prove with the requisite reasonable certainty, AlphaMed raises three principal arguments (in addition to its reliance on *Story Parchment*). While none of AlphaMed's arguments on this issue is persuasive, each will be addressed in turn. It is notable that with few exceptions, AlphaMed did not cite to record evidence to challenge Arriva's assertion that these assumptions were not proved.[48]

First, AlphaMed challenges its need to engage in a defense of these assumptions at all, arguing that "[t]he contention that AlphaMed can recover damages only upon a showing of each of the conditions *chosen* by Arriva is absurd and contrary to established law." [D.E. 931 at 11.] While AlphaMed appears to object to the fact that its adversary selected the assumptions, it makes no effort to contest that the as-

sumptions identified by Arriva form the foundation of its own lost profit claim, or to identify any other grouping of assumptions it maintains should apply. For example, AlphaMed cannot contest that its lost profit claim relied on proof, to a reasonable certainty, of the safety and efficacy of its yeast-derived recombinant protein AAT products.[49]

AlphaMed does not argue in opposition to Arriva's Motion that it presented any evidence sufficient to establish the safety or efficacy of AAT derived from *Pichia pastoris* yeast. Contrary to AlphaMed's unsupported contention that defense of such foundational assumptions is contrary to established law, "Florida law requires that assumptions used to support the conclusions be reasonably certain, not mere best case scenario predictions." *Sun Ins. Mktg. Network v. AIG Life Ins. Co.*, 254 F.Supp.2d 1239, 1247 (M.D.Fla.2003). *See also Nat'l Papaya Co. v. Domain Indus., Inc.*, 592 F.2d 813 (5th Cir.1979) (applying Florida law, vacating a lost profit damage award for failure to prove underlying assumptions); *Schonfeld*, 218 F.3d at 172 ("Projections of future profits based upon 'a multitude of assumptions' that require 'speculation and conjecture' and few known factors do not provide the requisite certainty.") (internal quotation omitted).

48. As the party opposing judgment as a matter of law, it was incumbent on AlphaMed to demonstrate that there was "a substantial conflict in evidence to support a jury question" on these issues. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1237 (11th Cir. 2001) (quoting *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

49. AlphaMed has not conducted any clinical tests of its proposed product, nor did it produce any expert testimony to verify that the product would be safe and effective. In fact, on this vitally important issue, Jarett Lezdey admitted that he had no idea whether *Pichia pastoris* derived AAT would work to treat the indications identified by AlphaMed [T.R. Vol.

16 at 110–113]. John Lezdey acknowledged that in some cases "AAT produced in yeast is 'different' and 'is expected to be rejected by the body over long term use'" [T.R. Vol. 23 at 124, ll. 9–11], and that AAT as expressed in yeast is not 100% pure [*id.* at 124, ll. 18–21; 128–129]. John and Jarett Lezdey also testified that the *Pichia pastoris* AAT generated by the University of Nebraska was never (even informally) tested utilizing AlphaMed's proposed delivery method (oral ingestion via pill) on the indications targeted by AlphaMed. Rather, the entire yield from the University of Nebraska (approximately one gram) was injected by John Lezdey into a dog to treat bone cancer. [T.R. Vol. 23 at 154–156; Vol. 16 at 161, ll. 9–19].

Next, AlphaMed invokes the jury's verdict to argue that all of Arriva's identified assumptions were proved to a reasonable certainty.

> [T]here was more than sufficient evidence in the record from which a reasonable jury could legally find that Arriva's misconduct [and not the failure of underlying assumptions] was the substantial cause of AlphaMed's lost profits. Indeed, after deliberating for several days, the jury found exactly that. When asked in Special Interrogatories as requested by Arriva whether 'Arriva's conduct led directly to and in natural and continuous sequence produced or contributed substantially to producing lost profit damages to AlphaMed,' the jury unanimously responded in the affirmative.

[D.E. 931 at 5].[50]

■■■ This argument entirely misses the point, as Arriva's Motion challenges the evidentiary support for the jury's findings, and therefore, its damage award. Without identification of support in the record, the jury's findings themselves cannot constitute legally sufficient evidence of causation to support AlphaMed's lost profit claim. *See Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172 (11th Cir.2002) (vacating jury

award of future commissions as too speculative); *Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1308 (11th Cir.1998) (reversing jury award of lost profits as supported by insufficient evidence).

Finally, AlphaMed relies on the testimony of its expert witness, Bratic. AlphaMed's chain of assumptions, however, is not solidified by virtue of the assumptions' incorporation into Bratic's opinion. Out of necessity, Bratic relied on the assumptions in AlphaMed's October 2000 business plan and the representations of the Lezdeys in forming his opinions. The Court's pretrial Order on the admissibility of Bratic's opinion recognized that such reliance, in and of itself, did not preclude his qualification as an expert. [D.E. 758 at 10 ("Bratic, whose expertise lies in conducting economic analyses, is not competent to render opinions as to the scientific or technical aspects of this case. Nor does Bratic's expertise qualify him to opine on AlphaMed's likelihood of obtaining the necessary regulatory approvals for its products (or whether regulatory approvals were even necessary).") ]. At trial, Bratic repeatedly acknowledged that he had no expertise, and was not qualified to offer opinions on the scientific,[51] or regulatory [52]

---

**50.** [*See also id.* at 17–18 ("Specifically, in response to Special Interrogatory No. 28, the jury found that (a) Mr. Williams would have loaned or invested between $750,000 and $1.5 million in AlphaMed after April 2001 but for Arriva's interference; (b) AlphaMed would have used the invested proceeds to resume the suspended AAT research at the University of Nebraska, and that the University would have successfully devised a method to produce commercial quantities of AAT at sufficient pure levels; (c) but for Arriva's interference, AlphaMed would have secured outside investment capital need [sic] to fund its Business Plan; (d) but for Arriva's interference, AlphaMed would have earned sufficient revenue from its anti-microbial products; (e) that AlphaMed would have obtained regulatory approval in countries other than the United

States for its proposed AAT products to treat human illnesses by the year 2005; (f) AlphaMed could have legally sold its AAT products to treat human illnesses in other countries; (g) AlphaMed would have secured a third-party manufacturer that was capable of producing commercial quantities of AAT; and (h) AlphaMed would have earned profits from the sale of its proposed AAT products.") ].

**51.** [T.R. Vol. 24 at 184, ll. 8–12; *id.* at 185, ll. 5–6; *id.* at 186, ll. 21–23; *id.* at 189, ll. 9–11; *id.* at 223, *l.* 23; T.R. Vol. 25 at 15, *l.* 19; *id.* at 16, ll. 10–11; *id.* at 26, ll. 5–15; *id.* at 27, ll. 3–4].

**52.** [T.R. Vol. 24 at 171, ll. 14–23; *id.* at 182, ll. 20–25; *id.* at 208, ll. 7–11; T.R. Vol. 25 at 50, ll. 20–22; *id.* at 62, *l.* 16].

aspects of this case. *See National Papaya Co.*, 592 F.2d at 821 (Expert witness "expressed no opinion on th[e] critical question of the validity of the assumptions, because the assumptions bore no relation to accounting principles and thus were beyond his field of expertise.").

The Court's holding that Bratic was "entitled to rely on AlphaMed's assumptions" concerning the "technical, scientific and regulatory" aspects of this case, [D.E. 758 at 10], did not relieve AlphaMed of the responsibility at trial to prove the factual bases on which those assumptions rested. *See Construction Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*, 710 F.2d 752, 789 (11th Cir.1983) ("an expert's projection of future profits must be supported by proven facts"); *TK–7 Corp.*, 993 F.2d at 732 ("the plaintiff failed to present evidence tending to establish the sales assumed by Dr. Boswell. The fact that Dr. Boswell relied upon the report in performing his calculation of lost profits did not relieve the plaintiffs from their burden of proving the underlying assumptions contained in the report").

Simply because Bratic assumed the following facts did not establish that any of these facts was proven to a reasonable certainty: that recombinant AAT was the same as plasma-derived AAT (and thus was the functional equivalent of an already approved drug, Prolastin) [T.R. Vol. 24 at 68, ll. 16–25; 79, ll. 17–24]; that AlphaMed could legally sell "consumer-ready" rAAT for humans and animals in the United States without FDA approval [*id.* at 160, ll. 5–17; 170–71]; and that AlphaMed had the rights to market rAAT, in part, because AlphaMed's proposed method of delivering rAAT for emphysema and asthma was not the same as Arriva's system (and thus not precluded by the Arizona court injunction that explicitly bound AlphaMed) [*id.* at 153–54]. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) ("Expert testimony is useful as a guide to interpreting ... facts, but it is not a substitute for them."); *Upper Deck Co., LLC v. Breakey Int'l, BV*, 390 F.Supp.2d 355, 361 (S.D.N.Y.2005) (" 'An expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case.' ") (quoting *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 69 F.Supp.2d 571, 579 (S.D.N.Y.1999), aff'd, 257 F.3d 256 (2d Cir. 2001)). In fact, AlphaMed failed to produce sufficient evidence that any of these assumptions was valid.

AlphaMed alternatively argues that Bratic's application of a 35% discount rate appropriately accounted for all of the various risks associated with AlphaMed's business strategy. [See Tr. of Oral Arg. at 49, 76.] Bratic's selection of a 35% discount rate, however, was also fatally undermined by his reliance on AlphaMed's assumptions. Bratic's description of the discount rate evidences that his selection of the rate was contingent on his unquestioning acceptance that: (1) AlphaMed's AAT product was not a new drug, it was only a new method of production for an existing drug; and (2) a portion of AlphaMed's AAT products could be sold without obtaining regulatory approval [See T.R. Vol. 16 at 68, ll. 16–25; 69, ll. 1–12]. Once again, AlphaMed did not produce sufficient evidence to establish either of these assumptions. *Schonfeld*, 218 F.3d at 174 (holding that damages expert failed to establish that his chosen discount rate "account[ed] for [*inter alia*] any inaccuracies in the revenue and expense assumptions" identified by the court); *Kidder, Peabody & Co.*, 28 F.Supp.2d at 134 ("a claimant cannot establish lost profits with the law's requisite certainty where its calculation is dependent upon a host of assumptions concerning uncertain contingencies, and applies

numerous variables about which an expert can only surmise.").

An "opinion has a significance proportioned to the sources that sustain it." *Petrogradsky Mejdunarodny Kommerchesky Bank v. National City Bank*, 253 N.Y. 23, 170 N.E. 479, 483 (1930) (Cardozo, J.). For Bratic's opinions to be of any use, AlphaMed was required to offer sufficient proof of the assumptions that Bratic accepted as the foundation for his opinion, most importantly—that AlphaMed's injury was caused by Arriva's conduct. Only upon such a showing could AlphaMed proceed to the next prong of its lost profit analysis and offer Bratic's opinion to provide the jury with a non-speculative estimation of the amount of AlphaMed's injury. To argue that Bratic's opinions may serve as evidence of causation fundamentally misconstrues both AlphaMed's burden in this action and Bratic's role as an expert witness on damages. *See Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., Ltd.*, 467 F.Supp. 841, 864 (N.D.Cal.1979) ("[Expert's]opinion, unsupported by facts, that but for defendants' conduct plaintiff would not have suffered losses does not convert the evidence of operating losses into evidence of damage flowing from defendants' antitrust violations."); *Halliburton Co.*, 672 So.2d at 846–47 ("An expert opinion from an outside economist with a Ph.D. projecting future revenues, profits and economic probabilities for the anticipated success of a prospective new business venture may provide a reasonable measure in a proper case for the loss of prospective profits in a business not yet begun, but it hardly addresses the causal relationship inquiry as to the proximate results of the breach itself.").

Accordingly, for the reasons articulated herein, AlphaMed failed to produce sufficient evidence to establish that Arriva's conduct caused its alleged lost profits dam-

age. *W.W. Gay Mech. Contractor, Inc.*, 545 So.2d at 1351. Because AlphaMed failed to prove the fact of damage—i.e., that it would have earned a profit (of any amount) but for Arriva's conduct—there is no reasonable basis for the jury's compensatory damage award in this matter. *See, e.g., Tietig v. SE Reg. Constr. Corp.*, 557 So.2d 98, 99 (Fla. 3d DCA 1990) (holding that the "lack of a causal relationship between the alleged 'interference'" and the alleged damage "precludes recovery as a matter of law."); *Stensby v. Effjohn Oy Ab*, 806 So.2d 542, 544 (Fla. 3d DCA 2001) (holding that plaintiff's claim failed because plaintiff "introduced no evidence that, if the agreement had not been breached, the venture itself would have otherwise been consummated.").

(3) *AlphaMed's Failure to Prove Damages Requires the Court to Vacate the Jury's Finding of Liability on the Claim for Tortious Interference.*

■ To prevail on its tortious interference claim, AlphaMed was required to show: (1) the existence of a business relationship; (2) the defendant had knowledge of the relationship; (3) the defendant intentionally and unjustifiably interfered with the relationship; and (4) the plaintiff suffered damage as a result. *See Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla.1994); *Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1473 (11th Cir.1989); *Tamiami Trail Tours, Inc. v. J.C. Cotton*, 463 So.2d 1126, 1127 (Fla. 1985). Because AlphaMed was unable to prove its entitlement to lost profit damages, the only measure of damages sought, AlphaMed's claim for tortious interference fails as a matter of law. *See Eclipse Medical, Inc. v. American Hydro–Surgical Instruments, Inc.*, 262 F.Supp.2d 1334, 1355–56 (S.D.Fla.1999) (" '[a]n integral element of a claim of tortious interference with a business relationship requires proof of

damage to the plaintiff as a result of the breach of the relationship.' Proof of nominal damages will not suffice.") (quoting *Worldwide Primates, Inc. v. McGreal*, 26 F.3d 1089, 1091 (11th Cir.1994)).

(4) *AlphaMed's Failure to Prove Damages Requires the Court to Vacate the Jury's Finding of Liability on the Claim for Unfair Competition.*

"The law of unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir.1974). In keeping with the expansive nature of this cause of action, AlphaMed's FAC sought to hold Arriva liable for "acts ... which are contrary to honest practice in industrial and commercial matters, and which were intended to cause and which are causing harm to AlphaMed." [D.E. 368 at ¶ 89]; [D.E. 724 at 52 (AlphaMed's Proposed Jury Instruction No. 25B) ("Examples of unfair competition include business interference, espionage, sabotage, and misrepresentation. You should consider all of the circumstances, methods, and means used by Arriva to determine whether Arriva engaged in unfairly competitive practices.")]. The jury made it evident through its verdict that it viewed AlphaMed's unfair competition claim as the catch-all component of the action into which it placed the entirety of Arriva's tortious conduct, including the acts which gave rise to AlphaMed's separate misappropriation of trade secrets and tortious interference claims. While many of the jury's findings are insufficient to support the verdict on the unfair competition count as a matter of law, a thorough analysis of each finding is unnecessary. The verdict on AlphaMed's unfair competition claim must be vacated because of AlphaMed's failure to prove damages.

Courts endeavoring to map the contours of Florida's elastic unfair competition cause of action "have recognized that the precise elements of the claim are somewhat elusive." *Treiber v. StorCOMM, Inc.*, 2005 WL 2012275 *3 (M.D.Fla. August 16, 2005) (citing *Audio Systems of Florida, Inc. v. Simplexgrinnell LP*, 68 U.S.P.Q.2d 1681, 1684 (M.D.Fla.2003); *Stoneworks, Inc. v. Empire Marble and Granite, Inc.*, 49 U.S.P.Q.2d 1760 (S.D.Fla. 1998)); *see generally* W. Page Keeton et al., Prosser & Keeton on the Laws of Torts § 130, at 1015 (5th ed.1984) ("unfair competition ... does not describe a single course of conduct or a tort with a specific number of elements; it instead describes a general category into which a number of new torts may be placed when recognized by the court.").

To the extent that courts enumerate the elements of an unfair competition claim generally, the overwhelming majority do so in contexts where the underlying acts are trademark or tradedress infringement (i.e., "palming off"). *See e.g., AlphaMed Pharm. Corp. v. Arriva Pharm., Inc.*, 391 F.Supp.2d 1148, 1167 (S.D.Fla.2005) (holding, at an earlier stage of the present litigation, that "[t]o establish a claim for unfair competition, Florida law 'requires that [plaintiff] establish deceptive or fraudulent conduct of a competitor and likelihood of consumer confusion.'") (quoting *Donald Frederick Evans and Assoc. v. Continental Homes, Inc.*, 785 F.2d 897, 914 (11th Cir.1986)). Because AlphaMed's currently constituted unfair competition claim does not sound in such matters, the element of "consumer confusion" is inapposite.

In the absence of elements that apply uniformly to all claims of unfair competition, the Eleventh Circuit has endorsed an approach which applies elements appropriate to the underlying acts of the unfair competition claim on a case by case basis.

*See Manufacturing Research Corp. v. Greenlee Tool Co.,* 693 F.2d 1037, 1040 (11th Cir.1982) (explaining that an unfair competition claim based on an act of tortious interference has the same elements as a tortious interference claim including "damage to the plaintiff as a result of the defendant's actions"); *CBS, Inc. v. Garrod,* 622 F.Supp. 532, 535–36 (M.D.Fla.1985) (noting that parties could not agree to requisite elements of unfair competition under Florida law, and pointing out that there is no Florida decision on point, but concluding that unfair competition involving record piracy requires proof of three elements—including "commercial damage"); *accord, Coast Cities Truck Sales, Inc. v. Navistar Intern. Transp. Co.,* 912 F.Supp. 747, 786 (D.N.J.1995) ("While the elements for unfair competition are not entirely clear, it seems likely that New Jersey law would find unfair competition where there has been tortious interference, which requires a demonstration of malice, or upon a finding of breach of good faith and fair dealing.").

The same standard was applied here, as the jury was instructed that damages were an essential element of AlphaMed's claim for unfair competition.

> The plaintiff's third and final claim is that defendant, Arriva, committed the tort of unfair competition. In order to establish this claim, the plaintiff must prove the following facts by a preponderance of the evidence: First, that Arriva committed an act that interfered with the plaintiffs ability to conduct its business. Second, that the act was intentional. Third, that the intentional act either violated a statute or was an independent tort and, fourth, that the plaintiff suffered damages as a result of Arriva's unlawful conduct.

[T.R. Vol. 38 at 17, ll. 7–17].

AlphaMed never objected to the inclusion of "damages" as an essential element of its claim for unfair competition. To the contrary, AlphaMed's proposed jury instruction for unfair competition tracked a standard jury instruction for tortious interference, Fla. Std. Jury Instruction [Civ.] 7.2, which expressly provides for a "damage" element. [D.E. 724 at 52 (AlphaMed's Proposed Instruction No. 25B)]. At the charge conference, AlphaMed explained that "[b]ecause there isn't a standard unfair competition instruction, that's why we went back to the tortious interference standard." [T.R. Vol. 35 at 22–23].

In addition, AlphaMed's proposed jury instruction cited as authority *Manufacturing Research Corp.,* 693 F.2d 1037, and *Teldar Communications Network, Inc. v. MCI Communications Corp.,* 46 F.Supp.2d 1324 (S.D.Fla.1999), *rev'd in part, vacated in part,* 228 F.3d 413 (11th Cir.2000), two cases which evaluated claims for unfair competition applying the elements for tortious interference. [*See. id.*]. Both cases recognize that a claim for tortious interference requires proof of damage. *Manufacturing Research Corp.,* 693 F.2d at 1040; *Teldar Communications Network, Inc.,* 46 F.Supp.2d at 1327.

While AlphaMed's proposed instruction was not adopted, the undersigned explained during the charge conference that proof of damages would be one of the elements of the unfair competition claim. AlphaMed expressly agreed. [T.R. Vol. 35 at 23, ll. 14–20]. Having never contested that damages was an essential element of its claim for unfair competition, or the jury instruction specifically requiring proof of damages, AlphaMed cannot do so now. *See* Fed.R.Civ.P. 51(c) ("A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds of the objection.").

Applying this Rule, the Eleventh Circuit has held that an instruction given

without objection becomes the law of the case, and cannot thereafter be attacked for legal sufficiency. *Shelby Ins. Co. v. Stocks*, 82 F.3d 1030, 1032 (11th Cir.1996) (district court had instructed the jury "rightly or wrongly," without objection, and therefore litigant could not later complain about the instruction); *United States v. Spletzer*, 535 F.2d 950, 954 (5th Cir. 1976) (court need not decide the "difficult question" of whether specific intent is always needed to establish a violation of 18 U.S.C. § 751(a), because defendant did not object to an instruction requiring specific intent, which became a "necessary element" under the "law of the case" doctrine); *Green v. Am. Tobacco Co.*, 325 F.2d 673, 676 (5th Cir.1963) (parties were bound by an implied warranty instruction given without objection "as a part of the law of this case"); *accord, Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 23 (1st Cir.2004) (although Massachusetts law entitled the plaintiff to nominal damages on her breach of contract claim even without proof of actual damages, the plaintiff forfeited her right to make that point on appeal, because she did argue that she was entitled to nominal damages in her response to defendant's pre verdict motion for judgment as a matter of law, and "herself asserted that proof of damages was an essential element.").[53] Accordingly, the law of the case dictates that proof of damages was an essential element of AlphaMed's unfair competition claim.

As the undersigned has already determined that AlphaMed failed to prove its lost profit damages in their entirety, it has also failed to prove any damage flowing from the acts of unfair competition identified by the jury. In the absence of such proof, the jury's verdict on AlphaMed's unfair competition claim cannot stand.

(5) *Vacation of the Jury's Award of Compensatory Damages in Their Entirety Requires the Vacation of the Jury's Punitive Damages Award.*

■■■ Under Florida law, AlphaMed's recovery of punitive damages is precluded by its failure to prove the essential element of damages with respect to its tortious interference claim and its unfair competition claim. *See Liggett Group, Inc. v. Engle*, 853 So.2d 434, 451 (Fla. 3d DCA 2003)(quoting *Ault v. Lohr*, 538 So.2d 454, 457 (Fla.1989) (Ehrlich, C.J., concurring) ("[w]here actual damage is an element of the underlying cause of action, an award of compensatory damages must be a prerequisite to an award of punitive damages.")); *Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 921 So.2d 43, 48 (Fla. 3d DCA 2006) ("Punitive damages must be proportionate to the actual harm inflicted on the plaintiff, and since the actual harm was not ascertainable, the punitive damages claim must fail.").

C. *Arriva's Motion for New Trial and, in the Alternative, Motion for Remittitur*

Because Arriva has prevailed on its Motion for Judgment as a Matter of Law, the Court must consider Arriva's Motion for New Trial pursuant to Fed.R.Civ.P. 50(c)(1). For the reasons set forth above, Arriva has demonstrated that it is alternatively entitled to a new trial as the jury verdict was against the great weight of the evidence. *Watts v. Great Atlantic & Pa-*

---

**53.** Indeed, even if an instruction erroneously "include[s] elements that are not dictated by statute," the failure to object means the instruction "nonetheless become[s] the law of the case." *United States v. Staples*, 435 F.3d 860, 866 (8th Cir.2006) (criminal convictions reversed because the jury instruction (proposed by the government) imposed a burden on the prosecution "to prove more than the statute required," and government failed to prove an element it otherwise need not have established).

*cific Tea Co., Inc.,* 842 F.2d 307, 310 (11th Cir.1988). In addition, Arriva has demonstrated its entitlement to a new trial because the jury failed to follow instructions.[54]

 "Failure by the jury to follow the court's instructions, which results in prejudice to the moving party, is a proper ground for a new trial." *Shushereba v. R.B. Industries, Inc.,* 104 F.R.D. 524, 529 (W.D.Pa.1985) (citing *Anderson v. Breazeale,* 507 F.2d 929 (5th Cir.1975)); *see also Thomas v. Stalter,* 20 F.3d 298, 303 (7th Cir.1994); *J.A. Jones Constr. Co. v. Steel Erectors, Inc.,* 901 F.2d 943, 944 (11th Cir.1990). Here, Arriva persuasively contends that the jury disregarded the Court's instruction concerning the litigation privilege and use of the Napper Report. Furthermore, Arriva has shown sufficient prejudice from each of these failures to warrant a new trial.

With respect to the litigation privilege, *see e.g., Jackson v. BellSouth Telecomm.,* 372 F.3d 1250, 1274–75 (11th Cir.2004) ("Florida's litigation privilege affords absolute immunity for acts occurring during the course of judicial proceedings."), the Court instructed the jury that

> AlphaMed has alleged that the litigation involving members of the Lezdey family in other states or other Federal Courts, including, but not limited to, the Arizona State Court action and the defense of the Protease involuntary bankruptcy

was wrongful or resulted in what AlphaMed contends was an incorrect result. You are instructed that, as a matter of law, you cannot find that either Arriva or Spinelli is liable in any way to AlphaMed, nor award any damages to AlphaMed because of the filing, prosecution or defense of the other lawsuits, including, but not limited to, the initiation of the Arizona lawsuit or the defense of the Protease involuntary bankruptcy, even if you otherwise find or believe that the other lawsuits were wrongful or incorrect, or if you sympathize with AlphaMed or members of the Lezdey family.

[T.R. Vol. 38 at 19, ll. 5–18]. Despite this instruction, the jury found Arriva liable to AlphaMed for unfair competition based, *inter alia,* on the Arizona litigation and the settlement agreement which concluded the Protease involuntary bankruptcy proceedings. [*See* D.E. 866 at 8–9 (Special Interrogatory No. 22) ]. The jury's willingness to disregard this clear instruction and attempt to hold Arriva liable for privileged conduct evidences significant prejudice against Arriva.[55]

In addition, both Bratic and the jury impermissibly relied on the Napper Report to award AlphaMed lost profits damages. Prior to trial, the undersigned had ruled that Bratic's reliance on the substance of Napper's Report, in the admitted

---

**54.** The conditional grant of Arriva's Motion for New Trial does not affect the finality of the judgment in Arriva's favor. *See Cooper v. Miami–Dade County,* 2004 WL 2044288 at *15 (S.D.Fla. July 09, 2004) (citing *Bazile v. Bisso Marine Co.,* 606 F.2d 101, 104 (5th Cir.1979)).

**55.** AlphaMed inappropriately invited such prejudice in its closing argument. [*See* T.R. Vol. 37 at 158, ll. 17–22 ("The reason I'm here, I saw a family and I saw the injustice and I saw what happened in Arizona and all over this country, and I saw what happened

by a big company that spends millions of dollars and the results of what can happen when you are outmanned and outgunned, and that's why I'm here away from my family."); *id.* at 184, ll. 15–21 ("[Arriva] spent millions of millions of dollars trying to destroy this man in court, outside of court, taking documents, spying, cheating, surveilling. It's horrible. It's horrible what they have done, and against all odds and these armies of lawyers and armies of investigators, we're here at the finish line and we're here for a verdict from you.") ].

absence of his own verification of that analysis, was "inappropriate" and "inadmissible" at trial. [D.E. 758 at 13].

While experts may base opinions on measurements or calculations prepared by others, see *Triton Corp. v. Hardrives, Inc.* 85 F.3d 343, 346 (8th Cir.1996), an expert is not permitted to rely on excerpts from opinions by other experts developed for use in other litigation. *In re Imperial Credit Indus., Inc. Secur. Litig.*, 252 F.Supp.2d 1005, 1012–1013 (C.D.Cal.2003) (*citing American Key Corp. v. Cole National Corp.*, 762 F.2d 1569, 1580 (11th Cir.1985)) ("Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not.") Expert testimony is inadmissible "where the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction." *TK–7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993).

[*Id.* at 12]. At trial, the Court permitted AlphaMed to introduce the Napper Report for a limited purpose: that it "may have some bearing on the methodology which Mr. Bratic used when providing his opinion testimony concerning AlphaMed's alleged damages." [*See* T.R. Vol. 34 at 76, ll. 7–17].

Despite the Court's rulings, it is apparent that Bratic improperly adopted the substance of Napper's analysis of Arriva's business plan to estimate AlphaMed's lost profits from sales of prescription AAT for emphysema and asthma. [*See* T.R. Vol. 25 at 50, ll. 4–5 ("There are no projections in the AlphaMed plan regarding emphysema and asthma ...."); *id.* at 53, ll. 4–6 ("The $33.6 million for emphysema and asthma, as I have said several times during my

testimony, came form Arriva's own business plan.") ]. In fact, when AlphaMed's counsel showed the jury a demonstrative chart from Bratic's report itemizing his estimate of lost profit damage, he was required to redact a footnote which evidenced Bratic's specific reliance on Napper's calculation of $33.6 million in lost profits for the emphysema and asthma indications. [See T.R. Vol. 24 at 80–82].

Furthermore, AlphaMed used its closing argument to impermissibly focus the jury's attention on the substance of the Napper Report and invited the jury to use Napper's analysis to calculate AlphaMed's damages. [*See* T.R. Vol. 37 at 34, ll. 12–13 ("As I recall, [Mr. Napper] gave Arriva a $42 million damage for a one-year delay for two indications. We have got a six-year delay with more indications than two."); *id.* at 38, ll. 15–20 ("For the prescription AAT, you would want to look at the Napper report, which you're going to see, and in that report look at Attachment B, Roman II—it's in there—and based on that schedule and coupled with Bratic's testimony, the lost profits for those products, the prescription AAT would be 42 percent."); *id.* at 183, ll. 14–20 ("[The Napper Report] gives you a yardstick. It let's you evaluate the appropriate damages in this case. Mr. Bratic's damages are very conservative. Think about it. They had a one year delay. Mr. Bratic is talking about five years delay and his damage calculation is $79.5 million and a one year delay in two indications is 40–plus million. So, it's conservative and he was conservative.") ].

The prejudice to Arriva with respect to the improper use of the Napper Report is clear. The jury attributed 70% of its lost profits award to AlphaMed's proposed "Prescription AAT" (i.e., hereditary emphysema and asthma) for which the only evidence introduced at trial was Bratic's

opinion which impermissibly adopted Napper's calculations. Thus, in determining a damage award, the jury must have either directly relied on the Napper Report itself (in violation of the Court's limiting instruction), or indirectly relied on the Napper Report through Bratic's adoption of Napper's calculations (in violation of the Court's pre-trial Order on Bratic's testimony). In either event, the jury's finding in this respect warrants a new trial. *Cf. Taylor v. Airborne Freight Corp.,* 155 F.Supp.2d 287, 292 (E.D.Pa.2001) (ordering new trial because the jury ignored court's instruction: "the only possible explanation for the jury's verdict... is that the jury improperly considered [statistical evidence] ... despite the court's instructions to the contrary.").

## IV. *CONCLUSION*

The jury undoubtedly felt a great deal of sympathy for the Lezdeys who presented a compelling narrative about a family and company wronged. The verdict expressed the jury's collective desire that Arriva and Spinelli should pay a price for their actions. The problem for AlphaMed, however, lay in its choice of remedy and its inability to meet the accompanying standard of proof. *See Taliferro v. Augle,* 757 F.2d 157, 162 (7th Cir.1985) (Plaintiff cannot be permitted to "throw himself on the generosity of the jury" for if "he wants damages he must prove them."). For all of the reasons addressed above, the Court cannot allow the jury's verdict in this case to stand.

Accordingly, and for all the reasons stated, it is **ORDERED AND ADJUDGED** that

1) Arriva's Renewed Motion for Judgment as a Matter of Law [D.E. 904] is **GRANTED**.

2) Arriva's Motion for New Trial and, in the Alternative, Motion for Remittitur [D.E. 923] is **CONDITIONALLY GRANTED**.

3) Spinelli's Corrected Renewed Motion for Judgment as a Matter of Law [D.E. 928] is **GRANTED**.

4) A final judgment will be entered in accordance with this Order.

5) All other pending motions are denied as moot.

### *FINAL JUDGMENT*

**THIS CAUSE** came before the Court on the Omnibus Order on Defendants' Post-Trial Motions, which granted, *inter alia,* judgment as a matter of law for Defendants, Arriva Pharmaceuticals, Inc. and Spinelli Corporation. Pursuant to Federal Rule of Civil Procedure 58, it is **ORDERED AND ADJUDGED** that judgment is entered in favor of Defendants Arriva Pharmaceuticals, Inc. and Spinelli Corporation, and against Plaintiff, AlphaMed Pharmaceuticals Corp. Plaintiff shall take nothing from Defendants, and the action is **DISMISSED** on the merits. The Court retains jurisdiction to consider the issue of attorney's fees and costs. The Clerk of the Court is instructed to **CLOSE** the case, and all pending motions not otherwise ruled on are **DENIED AS MOOT**.